CAMELLIA APARTMENTS, INC., the W & W Company, University Apartments, Inc.

v.

The UNITED STATES.

No. 344–62.

United States Court of Claims.

July 17, 1964.

Carl L. Shipley, Washington, D. C., for plaintiffs. Shipley, Akerman & Pickett, Washington, D. C., were on the briefs.

Joan T. Berry, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before JONES, Senior Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

WHITAKER, Judge.

The plaintiffs are three corporations which own and operate apartment houses located in the State of Georgia.[1] The buildings, which were designed for rent to war workers, were constructed with

1. Plaintiff Camellia Apartments, Inc. owns 400 rental units located in Columbus, Georgia. This building was constructed in 1949 with an FHA-insured mortgage of $2,701,000. Plaintiff The W & W Company owns 250 rental units located in Columbus, Georgia. This building was built in 1950 with an FHA-insured mortgage of $1,612,000. Plaintiff University Apartments, Inc. owns 276 rental units located in Decatur, Georgia. This building was constructed in 1950 with an FHA-insured mortgage of $2,002,500.

financing supplied through mortgages insured by the Federal Housing Administration pursuant to section 608 of the Federal Housing Act.[2]

After plaintiffs had owned the apartment buildings for some time, they obtained commitments to refinance their properties under conventional mortgages that were not FHA-insured. The Commissioner of the Federal Housing Administration, as a prerequisite to giving his assent to the refinancing, required plaintiffs to pay a "prepayment premium charge" equal to one percent of the original face amount of the mortgages. Plaintiffs paid these sums to their respective mortgagees, who transmitted them to the FHA. Each of them now sues to recover the amount of the prepayment charge, alleging that it was not authorized by statute or, if so authorized, was exacted in violation of the FHA's regulations and was therefore illegal.

The question thus posed is whether, under the National Housing Act or the regulations issued pursuant thereto, the Commissioner properly required plaintiffs to pay this "prepayment premium charge" for refinancing their mortgages.

Before we can reach these questions, however, we must first deal with defendant's contention that we lack jurisdiction over this suit. Defendant argues that, since plaintiffs mortgaged their properties to private financial institutions and paid the prepayment charges to these same institutions, there was neither privity of contract, nor any other formal legal relationship between the parties to this suit. Plaintiffs have no right to sue, says defendant, in the absence of a contractual obligation running from the FHA to the plaintiffs.

Plaintiffs' claim, however, is not based upon any contractual obligation. Although each of the mortgages contained a clause requiring the payment of any prepayment charge to the mortgagee, the gravamen of the petition is that the charges were exacted on behalf of the FHA, in violation of a statute and by virtue of the misconstruction of an administrative regulation. Under 28 U.S.C. § 1491, we are given jurisdiction of actions founded upon Acts of Congress or founded upon regulations of executive departments. The FHA regulations required the inclusion in the mortgages of the provision for the prepayment premium charge. The fact that the FHA acted through the mortgagees in requiring the payments of which plaintiffs complain is immaterial; under the pertinent regulation, the mortgagees were required to collect these funds and to remit them to the Commissioner.[3] Therefore, we do not think that defendant can seriously deny plaintiffs' allegation that the mortgagees acted solely as the FHA's agents in so doing. It is clear that they had no financial interest of their own in the prepayment charges.

When one of the plaintiffs, University Apartments, Inc., requested permission to refinance without penalty, moreover, it dealt directly with the FHA, and the agency denied permission in a letter sent directly to University. It did not insist, as defendant now does, that there was no legal relationship between it and this property-owner; it viewed the charge as payable directly into its coffers and insisted upon it. Its position then was that the payment was required by its regulation, a regulation it deemed authorized under the statute. In these circumstances, we do not think that defendant can deny the direct impact of that regulation and the underlying statute upon the plaintiffs. Plaintiffs' suit therefore, is "founded upon an Act of Congress" and is within our jurisdiction because it seeks recovery of an allegedly illegal exaction by officials of the Government purporting to act under a power conferred by Congress. Clapp v. United States, 117 F. Supp. 576, 127 Ct.Cl. 505, cert. denied, 348 U.S. 834, 75 S.Ct. 55, 99 L.Ed. 658 (1954).

---

2. 56 Stat. 301, 303 (1942), 12 U.S.C. § 1743 (1958).

3. See 24 C.F.R. § 282.4 (1949), quoted in pertinent part at pp. 4–5, infra.

We come now to the principal question before us: whether the FHA had power to require the payment of prepayment charges of one percent and whether that power was validly exercised in this case.

It seems indisputable that Congress conferred upon the Commissioner the authority to make such a charge. Section 603(c) of the National Housing Act [4] authorized him to fix a premium for the insurance of mortgages under title VI of the Act of between one and one-and-one-half percent of the principal amount of the mortgage and to require the payment of that premium into the fund from which insurance payments were to be made. That section further provides:

"In the event that the principal obligation of any mortgage accepted for insurance under this title is paid in full prior to the maturity date, the Administrator is further authorized in his discretion to require the payment by the mortgagee of an adjusted premium charge in such amount as the Administrator determines to be equitable * * *"

It is apparent on the face of the statute that the authority to demand a prepayment charge from certain mortgagees included within its scope the mortgagees that had financed plaintiffs' properties. Those properties were constructed and the mortgages were issued under section 608 of the Act, which is also a part of title VI. Even though section 608 was enacted a year later than section 603, authorizing the premium for prepayment, the provisions of the latter are applicable to the former. Section 608 merely added a new type of mortgage for which FHA insurance was authorized. It did not contain administrative provisions for the handling of the new type of mortgages, since those provisions were already in force as part

of section 603, which was intended to cover any program under title VI. Furthermore, after the enactment of section 608, Congress made significant amendments to section 603(c) but did not make the provision for prepayment charges inapplicable to mortgages issued under section 608. See section 10(d) of the Veterans' Emergency Housing Act of 1946, 60 Stat. 207, 213.

Under section 603(c), the Administrator was given a broad discretion: he was permitted to charge a prepayment premium in such amount as he thought "equitable". Under this authority and under the authority of section 607, which empowered him "to make such rules and regulations as may be necessary to carry out the provisions of this title" (55 Stat. at 61, 12 U.S.C. § 1742 (1958)), the Commissioner [5] laid down the following regulation, which was applied in plaintiffs' cases:

"*Prepayment premium charges.* (a) In the event that the principal obligation of any mortgage accepted for insurance is paid in full prior to maturity, the mortgagee shall within thirty (30) days thereafter notify the Commissioner of the date of prepayment and shall collect from the mortgagor and pay to the Commissioner an adjusted premium charge of one percent (1%) of the original face amount of the prepaid mortgage, except that if at the time of any such prepayment there is placed on the mortgaged property a new insured mortgage in an amount less than the original face amount of the prepaid mortgage, an adjusted premium charge shall be paid based upon the difference between such amounts at the rate applicable as above stated, depending upon the date of prepayment.

"(b) In no event shall the adjusted premium exceed the aggre-

4. 55 Stat. 55, 57 (1941), 12 U.S.C. § 1738 (c) (1958).

5. By section 3 of Reorganization Plan No. 3 of 1947, 61 Stat. 954, the title of

the Federal Housing Administrator was changed to that of Federal Housing Commissioner, and the Commissioner took charge of the duties of the Administrator.

gate amount of the premium charges which would have been payable if the mortgage had continued to be insured until maturity.

"(c) No adjusted premium charge shall be collected by the mortgagee in the following cases:

"(1) Where at the time of such prepayment there is placed on the mortgaged property a new insured mortgage for an amount equal to or greater than the original face amount of the prepaid mortgage; or

"(2) Where the final maturity date specified in the mortgage is accelerated solely by reason of partial prepayments made by the mortgagor which do not exceed in any one calendar year fifteen percent (15%) of the original face amount of the mortgage;

\*    \*    \*    \*    \*    \*

24 C.F.R. § 282.4 (1949).

Plaintiffs say that this regulation was unlawful in that it violated the Congressional mandate that prepayment charges must be "equitable" in amount. They argue that the only proper function of such a charge is to reimburse the insurance fund for the expenses of processing mortgage insurance and to defray the risk attendant upon the issuance of insurance. The gist of their contention is that the FHA must waive any part of the prepayment charge that it does not need to cover such expenses and risks.

We think that plaintiffs have given too narrow a scope to the factors that the Commissioner could take into account in deciding whether to require a prepayment charge and how much it should be. The basic statutory authority for the FHA to carry on a program of mort-

gage insurance carries with it the obligation of that agency to operate a financially sound program. Any person familiar with real estate financing knows that one of the primary purposes of a prepayment premium is its deterrent effect. As interest rates and the quality of risks fluctuate, there is at work something we might call a Gresham's Law of mortgages. Having assumed the position of an insurer of the economic stability of mortgagors, the Government might properly act to prevent a situation in which the risks it insures are only those that are marginal or worse. The FHA could, we think, deter mortgagors whose loss potential was relatively slight from turning to private financing, leaving it with only those mortgages that had no appeal to non-insured lenders. The Commissioner might properly prefer possession of a mixed bag to being left holding an empty one—not literally empty, but filled only with culls.[6]

Accordingly, we are not impressed by plaintiffs' argument that the insurance fund was more than ample to cover any foreseeable risks, even those that would arise in the event of a severe depression. That fund was generated by prior premium payments by mortgagors situated similarly to plaintiffs, including payments exacted under this regulation. Plaintiffs now seek to benefit because those payments helped to build up a large fund. Putting to one side the question whether the problem of an inordinately large fund is, in reality, one for Congress to resolve, the fact remains that not the least of the elements of a program designed to be "equitable" is that persons in like circumstances receive like treatment. The FHA did not require plaintiffs to do anything more than was required of other mortgagors who wished to refinance. Indeed, it is

---

6. The regulation permitted a waiver of all or a part of the prepayment premiums in the event the prepaid mortgage was replaced with another insured one. Presumably, in such a case, the FHA was willing to forego the charge to the extent it retained the risk that the mortgagor and his property represented. This lends further support to our conclusion that the Commissioner's purpose in requiring the prepayment premium was to deter sound mortgagors from leaving his fold rather than simply to compensate the agency for any out-of-pocket loss it might sustain by reason of acceleration.

plaintiffs who seek preferred treatment, since they seek to benefit from the payments made by others. We conclude that the Commissioner was well within his rights to require plaintiffs to make payments on the same basis as other mortgagors.

■ For the same reason, we must reject plaintiffs' contention that the Commissioner shirked his duty in deciding their cases under a general regulation and by failing to accord them an evidentiary hearing.

■ Plaintiffs' alternative line of attack is that the FHA wrongly construed its regulation by refusing to give cumulative effect to the provisions of paragraph (c) (2) thereof, which permits prepayment without payment of a premium in amounts "which do not exceed in any one calendar year fifteen percent (15%) of the original face amount of the mortgage." Plaintiffs argue that, since they were entitled to prepay 15 percent per year and since their mortgages were more than 6⅔ years old, they could, without payment of any charge, liquidate their indebtedness in full at any time. The difficulty with this argument is that it ignores both the clear language of the regulation and the policy behind it. Paragraph (c) (2), by its terms, applies only to "*partial* prepayments" of not more than 15 percent of the mortgage principal made "*in any one calendar year*." [Emphasis added.] Since plaintiffs paid more than the maximum permissible amount in one such year, they do not come within the terms of this exception.

As we have previously noted, one purpose of this regulation is to insure that the FHA's portfolio remains a balanced one, that it does not consist entirely of mortgages which, because of their speculative character or unusually high degree of risk, are unattractive to lenders that lack insurance commitments. Paragraph (c) (2) of the regulation was not, in short, intended to permit ready and cheap refinancing of precisely those mortgages which the Commissioner was most anxious to retain. It was not intended that the 15 percent limitation on prepayments should be cumulative.

It is true that under paragraph (c) (2) a mortgagor was privileged to prepay up to 15 percent of the face amount of the mortgage each year without paying a premium. The existence of this privilege, however, does not detract from the general policy behind the regulation. To the extent that payments are accelerated, the mortgagor's equity increases in size, and this may well be a desirable objective for its own sake. A mortgage that is partially prepaid, moreover, is a less risky proposition than one that bears a greater burden of debt. The ability to prepay is substantial evidence of the financial solidity of the mortgagor, and the Commissioner, in line with his general policy of upgrading his portfolio, might reasonably have desired to obtain and retain such a risk. This policy and these objectives, of course, have no application to a prepayment—at whatever stage of the life of the mortgage—that is made pursuant to complete refinancing, which would remove the mortgage from the FHA's pool of risks.

We therefore conclude that the FHA's regulation was valid and was properly applied to these plaintiffs. They are not entitled to recover.

Plaintiffs' motion for summary judgment is denied, and defendant's cross-motion for summary judgment is granted. The petition is dismissed.