104 F.3d 1333
 Leonard R. SHEWFELT, John F. Garland, Imperial County Land
Company and Leonard R. Shewfelt, as Administrator
of the Estate of Patrick Shewfelt,
deceased, Plaintiffs/Cross-Appellants,
v.
The UNITED STATES, Defendant-Appellant.
 Nos. 96-5009, 96-5010.
 United States Court of Appeals,
Federal Circuit.
 Jan. 17, 1997.
Rehearing Denied March 17, 1997.
 
 Richard Laskin, Laskin & Graham, Glendale, CA, argued for plaintiffs/cross-appellants.
 Jacques B. Gelin, Attorney, Environment & Natural Resources Division, Department of Justice, Washington, D.C., argued, for defendant-appellant. Also on the brief, were Lois J. Schiffer, Assistant Attorney General, Albert M. Ferlo, Jr. and Silvia Sepulveda-Hambor, Attorneys. Of counsel, were Edward J. Shawaker, Attorney, Department of Justice, and Ray Goldstein, Naval Facilities Engineering Command, U.S. Department of the Navy, Alexandria, VA.
 Before ARCHER, Chief Judge, RICH, Circuit Judge, and FRIEDMAN, Senior Circuit Judge.
 FRIEDMAN, Senior Circuit Judge.
 
 
 1
 The Court of Federal Claims held that the United States had taken the contingent rights that the appellees had to redeem real property in California and awarded them just compensation. The real property had been deeded to the state for non-payment of county taxes, and the county where the property was located had sold it to the United States after the state, which had acquired title to the property, sold it to the county. The state's sale of the property to the county extinguished the redemption rights. The Court of Federal Claims held that the involvement of the United States in the foregoing transactions constituted a taking of the appellees' contingent right to redeem the property. We hold that the actions of the United States did not constitute a taking, and therefore reverse.
 
 I.
 
 2
 A. Under California law, if county real property taxes were unpaid for one year, the county "sold" the property to the state. Cal. Rev. & Tax Code § 3436 (West 1980), amended by Stats.1984, ch. 988, § 19, eff. Sept. 11, 1984. This sale, however, was only for bookkeeping purposes and did not transfer title. If taxes remained unpaid for an additional five years, the county deeded the property to the state, which obtained legal title. Cal. Rev. & Tax.Code § 3511 (West 1980), repealed by Stats.1984, ch. 988, §§ 34-35, eff. Sept. 11, 1984. During this six year period, the former owner or its successor had the absolute right to redeem the property by paying the accrued taxes. After six years, however, the former owner or its successor in interest had only a conditional right to redeem the land, see Glunt v. City of San Francisco, 274 Cal.App.2d 269, 79 Cal.Rptr. 513, 519 (1969), which was extinguished by the state's sale of the property to a third party. Before selling any tax deeded property, the state had to give registered mail notice to the "last assessee of record" in the county assessor's records. Cal. Rev. & Tax.Code § 3799 (West 1980), amended by Stats.1984, ch. 988, § 67, eff. Sept. 11, 1984.
 
 
 3
 B. The real property here involved was part of a gunnery range in California that the Navy had used for many years. The Navy acquired the northern half of the gunnery range in fee by condemnation proceeding. Beginning in 1944 the Navy through condemnation acquired temporary leasehold interests in the southern half of the gunnery range--from 1944 until 1955 on a yearly basis, and from 1955 until the late 1970's for five-year terms. In 1976, Congress, in the Military Construction Authorization Act, Pub.L. No. 94-431, 90 Stat. 1349, 1353 (1976), authorized the Navy to acquire fee title to all land in the southern half of the gunnery range.
 
 
 4
 Although the Navy originally planned to acquire the land in the southern part of the gunnery range through purchase or condemnation, it soon discovered that that procedure would involve serious administrative problems and considerable expense. In the 1930's the county had removed large areas of land, including that in the gunnery range, from its tax rolls because the cost of maintaining such records exceeded the revenues produced. The property eventually was returned to the tax rolls in 1960, but the county assessor never updated the records to reflect changes in ownership or interest that occurred between 1930 and 1960. Because of the disarray in the county assessor's office records, only one title company was willing to do the title work on the gunnery range lands and only at great expense. The Navy, therefore, decided to do its own title examination. It quickly ascertained that almost half of the parcels in the area had been tax-deeded to the state.
 
 
 5
 Upon further study, the Navy concluded that it could acquire the land and avoid these problems if the state sold its tax-deeded property to the county and the county in turn resold it to the Navy. Accordingly, in May 1978 the Navy offered to purchase from the county approximately 2100 parcels of tax-deeded land comprising almost 35,000 acres at $20 per acre. On September 11, 1979 the Navy and the county executed a written purchase agreement. Approximately eight months later, on May 5, 1980, the state controllers' office authorized sale of the property from the state to the county. Thereafter, the state sold the parcels to the county. In July, September and November 1980, the county by quit-claim deeds conveyed the land to the Navy. The state's sale of the land to the county extinguished any redemption rights of the former owners of the tax-deeded property.
 
 
 6
 As noted, California law required the state, before selling tax-deeded property, to give registered mail notice to the "last assessee of record" shown in the county assessor's records. Before selling the parcels here involved to the county, the state attempted to give such notice. Because of the defects in the records of the county assessor's office, however, many of the holders of conditional redemption rights, not all of whom were last assessees of record, did not receive notice of the proposed sale to the county. Shewfelt received notice with respect to some of the parcels in which he claimed redemption rights, but apparently not with respect to most of them.
 
 
 7
 C. In 1960, Shewfelt began purchasing interests in the land in the gunnery range. When the Navy developed its plan to acquire the tax-deeded parcels in the southern gunnery range, it was aware that Shewfelt claimed an interest in a number of those parcels. It also was aware of the chaotic state of the county assessor's records relating to those properties.
 
 
 8
 After the Navy acquired the land by purchase from the county, Shewfelt and his related entities (collectively "Shewfelt") in 1983 filed a complaint in the Court of Federal Claims alleging that the Navy's acquisition, by quit-claim deeds from the county, of the parcels in which Shewfelt claimed an interest "without any notice to these plaintiffs ... amounted to a taking of plaintiffs' real property without compensation in violation of the Fifth Amendment of the United States Constitution." They sought just compensation for the alleged taking of at least $1,000,000.
 
 
 9
 After a trial on liability, the Court of Federal Claims held that the United States had taken the plaintiffs' property interests. In a seventy-three page opinion, the court held that (1) "the right to redeem tax-deeded property [created by California law] constitutes a property interest that may be the subject of a taking"; and (2) although it was the state of California that terminated Shewfelt's conditional redemption rights, the United States had a "direct and substantial involvement" "in directing this project" and therefore was liable for a taking. See Shewfelt v. United States, No. 734-83L (Cl.Ct. Sept. 29, 1988) (unpublished). The court ruled that "the method chosen by the Federal Government to acquire the tax-deeded parcels was defective because it did not provide adequate notice to the holders of the rights of redemption. Thus, the method used by the Navy to acquire the tax-deeded parcels did not provide a constitutionally permissible substitute for the congressionally-mandated condemnation process." Id. at 60. The court stated that "[g]iven the unusually long and tortured history of this case and the land at issue, reliance on state law and procedure to provide adequate notice and protect private property interests was plainly insufficient." Id. at 61. The court announced that if the parties were "unable to stipulate as to the amount due the plaintiffs, a trial to determine just compensation will be held." Id. at 73.
 
 
 10
 D. While the Court of Federal Claims proceedings were pending, Shewfelt, in November 1984, filed suit under 42 U.S.C. § 1983 in the United States District Court for the Southern District of California against the county, two of its officials, and the state. The complaint alleged that the defendants "knowingly and intentionally conspired and agreed among themselves to deprive plaintiffs of the title to their real property by means of improper tax-deed proceedings." The United States intervened as a defendant because of its obligation under its 1979 land purchase contract with the county to indemnify the latter.
 
 
 11
 On the defendants' motion for summary judgment, the district court held that under California law conditional rights of redemption in tax-deeded realty were not property interests and dismissed the suit. Shewfelt noted an appeal to the Ninth Circuit, but on his failure to pursue the case, the court of appeals dismissed the appeal for non-prosecution. Shewfelt v. County of Imperial, No. 89-55886 (9th Cir. March 14, 1990) (unpublished).
 
 
 12
 The government then moved to dismiss the Court of Federal Claims suit on the ground that the decision of the district court that conditional rights of redemption are not property rights under California law was res judicata on that issue and entitled to issue-preclusive effect because that was the first ruling on the issue that constituted a final judgment. The court denied the motion because "the issue of the Government's liability to the plaintiffs in the instant suit was actually determined by this Court, a court of competent jurisdiction, in an earlier decision. This decision, therefore, is conclusive in this subsequent proceeding, regardless of the intervening suit against the County of California." Shewfelt v. United States, No. 734-83L (Cl.Ct. Nov. 4, 1992) (unpublished) at 11-12.
 
 
 13
 The parties subsequently stipulated that the amount of Shewfelt's damages for the tax-deeded parcels was $400,000 and the Court of Federal Claims entered judgment for Shewfelt for that amount plus interest.
 
 II.
 
 14
 In its appeal the United States contends (1) that the Court of Federal Claims erroneously failed to give preclusive effect to the decision of the California district court that conditional redemption rights are not property rights under California law; (2) that these interests are not property rights cognizable under the Fifth Amendment; and (3) that if they are such property rights, the United States did not take them. We hold the actions of the United States in this case did not constitute a taking of whatever conditional redemption rights Shewfelt may have had in the tax-deeded property the county sold to the United States, and therefore do not decide the first two issues.
 
 
 15
 A. California law created the conditional right of redemption of tax-deeded property, and it is California law that determines the parameters, conditions and extent of that right. Under California law, the owner of real property has the absolute right to redeem it by paying back taxes for six years after the county acquired the property for non-payment of taxes. After that six-year period, however, the right of redemption becomes conditional: it must be exercised before the state sells the property to a third party. Such a sale by the state extinguishes the conditional right of redemption.
 
 
 16
 In the present case, it is undisputed that it was California's sale of the land to the county that terminated whatever conditional rights of redemption Shewfelt may have had. The Court of Federal Claims stated in its pretrial order of February 27, 1991 on damages that "to avoid any further factual and legal confusion, the Court hereby chooses the date of September 11, 1979, as the 'date of taking' for the purposes of liability." That was the date on which the county and the Navy signed the agreement under which the Navy purchased the land from the county. That agreement, however, did not change in any way Shewfelt's contingent right to redeem the property. He could have done so the next day by tendering the unpaid back taxes. Shewfelt's contingent redemption rights continued without change up to the date on which the state sold the property to the county.
 
 
 17
 Indeed, the Court of Federal Claims recognized that it was the action of the state and not of the United States or the county, that extinguished Shewfelt's contingent redemption rights. In holding that Shewfelt was not entitled to just compensation for the four parcels for which he received actual notice of the state's proposed sale, the court stated: "Because Mr. Shewfelt received actual notice and chose to ignore it, his interest in these four parcels was extinguished prior to the transfer of the property to the United States." Shewfelt v. United States, No. 734-83L (Cl.Ct. Sept. 29, 1988) (unpublished) at 66. It was the extinguishment of Shewfelt's contingent redemption rights that Shewfelt contends constituted the taking of his property; that extinguishment, however, resulted from the action of the state of California, not that of the United States.
 
 
 18
 B. Where, as here, an entity other than the United States took the action that resulted in the injury to private property, the United States may be held liable for a taking only if its involvement "is sufficiently direct and substantial to require compensation under the Fifth Amendment." National Bd. of YMCA v. United States, 395 U.S. 85, 93, 89 S.Ct. 1511, 1516, 23 L.Ed.2d 117 (1969). Contrary to the view of the Court of Federal Claims, we conclude that the involvement of the United States in the state's sale of the tax-deeded property to the county was not "sufficiently direct and substantial" to make that involvement a taking by the United States.
 
 
 19
 The rationale of the Court of Federal Claims was that because the United States was aware of the inadequate county records and therefore knew, or should have known, that the state would not have been able to give adequate notice of its proposed sale of the tax-deeded property, the United States took Shewfelt's interest in the land when it decided to purchase the land from the county instead of following its usual practice, which Congress had specifically authorized, of purchasing or condemning the property. The court suggested, or perhaps even indicated, that in following the course it did, the Navy denied Shewfelt due process of law--a conclusion that seems more to reflect the standards of the due-process clause than those of the takings clause of the Fifth Amendment.
 
 
 20
 In Fern v. United States, 908 F.2d 955 (Fed.Cir.1990), this court rejected a similar attempt to impose taking liability upon the United States based on its knowledge or expectation that the state would take the action that produced the injury. California had treated military retired pay as community property, to be divided between divorcing spouses. After the Supreme Court held in McCarty v. McCarty, 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981), that federal statutes governing military pay by preemption barred state courts from treating military retired pay as community property, Congress in the Uniform Services Former Spouses Protection Act, Pub.L. No. 97-252, 96 Stat. 718 (1985) (codified at 10 U.S.C. § 1408(c)(1) (1988)) (FSPA), authorized state courts "to treat disposable retired pay as property solely of the retiree or as property of the retiree and his spouse." Id. at 956. The plaintiffs were retired members of the armed forces who contended that in that statute the United States took their property by permitting California to award half of their retired pay to their former spouses. In affirming the decision of the United States Claims Court that there had been no taking by the United States, this court stated:
 
 
 21
 It is true that Congress expected community property states would be likely to take steps to divide military retired pay between spouses under divorce decrees after enactment of FSPA. However, we cannot agree that the award of benefits to Fern's former spouse by the state became an act of the United States because Congress was aware that the community property states could take this action if Congress lifted the bar of preemption. Nor is the United States the actor with respect to the retroactive application of state law to payments Fern received after June 25, 1981. While allowing state law to be applied retroactively, FSPA itself had no direct effect, retroactive or otherwise, on division of the payments. This decision was left entirely up to each state.
 
 
 22
 Id. at 959.
 
 
 23
 Similarly, in the present case, although the Navy "expected" that California "would be likely" to transfer the tax-deeded property to the county, that "act" by California did not "bec[o]me an act of the United States because [the Navy] was aware" that California would do so if the Navy signed the contract to purchase the property from the county, and the Navy was not "the actor with respect to" California's alleged non-compliance with the notice requirements of state law.
 
 
 24
 Langenegger v. United States, 756 F.2d 1565 (Fed.Cir.1985), cert. denied, 474 U.S. 824, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985), rejected a claim that the United States was responsible under the just compensation clause of the Fifth Amendment for the expropriation of the plaintiffs' property in El Salvador by the government of that country, where such appropriation "was mandated by a foreign sovereign's legislation passed at the prompting of the United States, and hemispheric stability is an ultimate benefit hoped for by the United States." Id. at 1567. The court stated that "[t]he United States may be held responsible for a taking even when its action is not the final direct cause of the property loss or damage," but only if "sufficient direct and substantial U.S. involvement exists." Id. at 1570-71 (emphasis in original). In holding that there had been no taking by the United States, the court stated:
 
 
 25
 Where the actual expropriation is by the hand of a foreign sovereign, the United States cannot be held responsible merely because its activity is that of "friendly" persuasion regarding general policy, common among allies, or when the sole benefit to the United States is the political stability of its neighbors. Diplomatic persuasion among allies is a common occurrence, and as a matter of law, cannot be deemed sufficiently irresistible to warrant a finding of direct and substantial involvement, however difficult refusal may be as a practical matter.
 
 
 26
 Id. at 1572.
 
 
 27
 In the present case, also, the United States is not liable for a taking based on its persuasion of the county to obtain the property from the state for resale to the Navy. See also Erosion Victims of Lake Superior Regulation v. United States, 833 F.2d 297 (Fed.Cir.1987) (government's successful request to international joint commission to raise water levels of Lake Superior did not constitute "direct and substantial" United States involvement in commission's decision that constituted taking by the United States, because United States did not have "pervasive influence" over commission).
 
 
 28
 There have been a few instances in which the United States' endeavors to persuade another entity to take particular action have been held "sufficiently direct and substantial" to make the United States liable for a taking. See, e.g., United Nuclear Corp. v. United States, 912 F.2d 1432 (Fed.Cir.1990); cf. Turney v. United States, 126 Ct.Cl. 202, 115 F.Supp. 457 (1953). The determination whether there has been a taking, however, depends upon all the facts of a particular situation, see Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 123-24, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), and the facts in those cases in which there was a taking are sufficiently different from those in the present case to make them inapplicable.
 
 
 29
 C. In sum, it was California and not the United States that took the action that resulted in the extinguishment of any interest Shewfelt may have had in the tax-deeded lands the Navy purchased from the county. The involvement of the United States in that transaction was not "sufficiently direct and substantial" to make the United States liable for a taking of that interest. If Shewfelt has any valid taking claim resulting from the extinguishment, it would be against California, and not against the United States.
 
 
 30
 D. Our conclusion that there has been no taking by the United States renders moot the issue raised in the cross-appeal whether Shewfelt should have received compound rather than simple interest on the judgment the trial court entered for him.
 
 CONCLUSION
 
 31
 The judgment of the Court of Federal Claims awarding Shewfelt just compensation is
 
 
 32
 REVERSED.