**CASA DE CAMBIO COMDIV S.A. de C.V., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 99–910C.

United States Court of Federal Claims.

Oct. 27, 2000.

Thomas C. Jackson, Kelly, Drye & Warren LLP, Washington, D.C., attorney of record for plaintiff.

Doris S. Finnerman, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General David W. Ogden, for defendant.

## OPINION

ALLEGRA, Judge.

In its complaint, Casa de Cambio Comdiv S.A. de C.V. (plaintiff or Casa) claims that it was damaged when the Department of the Treasury (Treasury) allegedly failed to follow its regulations by waiting several months before dishonoring a stolen check that plaintiff had received from a third party and presented to its bank. When, at Treasury's request, the Federal Reserve Bank recouped the funds that had been provisionally credited to the plaintiff's bank, the latter bank, in

turn, debited the plaintiff's account. Plaintiff alleges that it is entitled to compensation under the relevant Treasury's regulations and that the Treasury's actions also amount either to a taking of its funds requiring just compensation or an illegal exaction of such funds. Defendant has moved to dismiss the complaint under RCFC 12(b)(1) and 12(b)(4).

## I. Facts [1]

Casa is an international currency exchange company incorporated under the laws of Mexico, with its principal place of business in Mexico City, Mexico. On or about October 29, 1993, a Genaro Alvarez ("Alvarez") presented Casa with a check drawn on the Treasury in the amount of $1,165,000 (the "Check"), listing Alvarez as the payee. Casa gave value for the Check and forwarded it to Norwest Bank, Minnesota–N.A. ("Norwest"), for deposit and collection. On November 1, 1993, Norwest forwarded the Check to the Federal Reserve Bank of Minnesota ("FRB–M") for collection. On November 4, 1993, the FRB–M debited the Treasury's unclassified account and gave immediate provisional credit for the Check to Northwest. Notification of the debit and a microfilm copy of the Check were then forwarded to the Treasury. On November 5, 1993, Casa verified that the funds had been collected and were available in its account at Norwest.

On or about November 17, 1993, the Treasury was informed that a number of its checks had been stolen from the U.S. Postal Data Service Center in St. Louis, Missouri. One of the stolen checks bore the same serial number as the Check. On November 23, 1993, the Treasury confirmed that the Check had been presented and paid. However, it was not until more than two months later, on February 1, 1994, that Treasury ordered the FRB–M to credit the full amount of the Check to its account. The FRB–M complied with this request, reversing the prior provisional credit and debiting Norwest's account,

1. "[I] n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The court must presume that the factual allegations included in the complaint are true. *See Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988).

for the full amount of the Check. Norwest then reimbursed itself by debiting Casa's account. By February 2, 1994, as a result of the debit, Casa's account at Norwest was overdrawn by $659,665.63.

Plaintiff filed suit in this court on October 29, 1999, seeking compensation from defendant under the Treasury Regulations, for the taking of its property, and for an illegal exaction. On March 31, 2000, defendant filed a motion to dismiss all three counts of the complaint for lack of subject matter jurisdiction and for failure to state a claim for which relief may be granted. Oral argument was heard in this case on September 13, 2000.

## II. Discussion

The Code of Federal Regulations specifies the procedures that Treasury must follow in dishonoring checks or reclaiming amounts erroneously paid thereon. The parties agree that the regulations permit the Treasury to decline payment of a forged check, 31 C.F.R. §§ 240.3(c), 240.3(d) and 240.9(a)(3)(iv) (1993), and that the portion of the regulations dealing with reclamations, 31 C.F.R. § 240 .6 (1993), is inapplicable here because the defendant's reversal of the check was purportedly a declination, rather than a reclamation. However, plaintiff argues that Treasury did not comply with that portion of the declination regulations requiring it to decline payment "within a reasonable time." 31 C.F.R. §§ 240.3(c) and 240.9(a)(3)(iv) (1993).

This basic assertion forms the heart of the three separate counts in plaintiff's complaint. In Count I, plaintiff argues that the Treasury's regulations are money-mandating and that Treasury's failure to follow those procedures requires defendant to pay the "direct damages" incurred by Casa as a result of the violation.[2] Count II alleges that Treasury's action in reversing the provisional credit violated the Due Process Clause of the Constitution and resulted in an "illegal exaction." Finally Count III avers that if Treasury's action was authorized by the regulations, the

reversing of the provisional credit constituted a taking of plaintiff's funds under the Fifth Amendment to the Constitution. Defendant seeks the dismissal of each of these counts, alleging lack of jurisdiction and a failure to state a claim.

The court will deal first with plaintiff's claim that the Treasury Regulations are money-mandating and then turn to plaintiff's takings and illegal exaction claims.

### A. The Treasury Regulations

In Count I of its complaint, plaintiff alleges that it is entitled to damages based upon the Treasury's violation of its regulations. Defendant, for its part, argues that such regulations are not "money-mandating" and thus do not provide an independent basis for jurisdiction in this court.

The Tucker Act, 28 U.S.C. § 1491(a)(1), grants this court jurisdiction over monetary claims based on an alleged violation of a federal statute, providing that the "Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded ... upon ... any Act of Congress or any regulation of an executive department ...." The Tucker Act, however, merely confers jurisdiction on this court, it does not "create any substantive right enforceable against the United States for money damages." *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (quoting *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), *reh'g denied*, 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980)); *see also Saraco v. United States*, 61 F.3d 863, 865 (Fed.Cir.1995), *cert. denied*, 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996) (citing *Zumerling v. Devine*, 769 F.2d 745, 749 (Fed.Cir.1985)); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983) (en banc), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984). Individual claimants, therefore, must look beyond the

---

2. According to the complaint, these damages include $1,165,000, for the value of the Check; $700,000 for the value of the loss of use of the funds; $165,000 in expenses incurred to cover clients' checks returned unpaid due to the overdraft in plaintiff's Norwest account; $270,000 in

expenses incurred in seeking to recoup the funds from the persons responsible for perpetrating a fraud against the plaintiff; and $5.5 million for the value of plaintiff's business, which it alleges was "confiscated" due to the reverse payment on the Check.

jurisdictional statute for a waiver of sovereign immunity. *See Mitchell*, 445 U.S. at 538, 100 S.Ct. 1349. For claims founded upon a statute or regulation to be successful, the provisions relied upon must be susceptible to fair interpretation as "mandating compensation by the Federal Government." *United States v. Testan*, 424 U.S. at 400, 96 S.Ct. 948 (quoting *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002, 1009 (1967)).

◼ Plaintiff argues that because, under the regulations, Treasury has a reasonable time to examine checks and decline payment, "[i]t is logical that the consequences to the Treasury of its failure to make its examination within a reasonable time, while not specified in the text of the regulations, can fairly be read to include payment of compensation." The court is not persuaded. The Supreme Court made clear in *Testan* that "the violation of any statute or regulation ... [does not] automatically create[ ] a cause of action against the United States for money damages." 424 U.S. at 401, 96 S.Ct. 948. It explained that "[i]n a suit against the United States, there cannot be a right to money damages without a waiver of sovereign immunity," concluding further that "we regard as unsound the argument ... that all substantive rights of necessity create a waiver of sovereign immunity such that money damages are available to redress their violation." *Id.* at 400, 96 S.Ct. 948. Along these lines, this Court has held "[i]t is not enough that plaintiff sustained money damages; plaintiff must point to a specific source of substantive law that 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *Son Broadcasting, Inc. v. United States*, 42 Fed. Cl. 532, 535 (1998) (quoting *Testan*, 424 U.S. at 400, 96 S.Ct. 948).

Here, as plaintiff admits, the relevant provisions do not provide for monetary relief if violations occur and, contrary to plaintiff's claim, appear directed only at protecting the Treasury's rights, rather than those of third parties. In fact, the regulations do not so much as mention depositors, depository institutions or presenting banks, stating instead, in relevant part, only that "[t]he Treasury shall have the usual right of a drawee to examine checks ... and refuse payment" and "shall have a reasonable time to make such examination." 31 C.F.R. § 240.3(c). Accordingly, nothing in the language of the regulation unequivocally grants a depositor in plaintiff's position a right to recover damages either "expressly or by implication." *Eastport S.S.*, 372 F.2d at 1007. *See also Brown v. United States*, 86 F.3d 1554, 1564 (Fed.Cir.1996) ("[t]he substantive law mandating compensation may be either express or implied, but it must be unambiguous"). Therefore, plaintiff's claim based upon Treasury's alleged violation of the regulations must be dismissed for lack of jurisdiction.

### B. Takings

◼ The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." The Just Compensation Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). The case law has identified two categories of takings—physical and regulatory. A physical taking occurs when the government seizes property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). By contrast, a regulatory taking occurs when the government imposes a condition on private property that limits or prohibits any beneficial use thereof by the private owner. *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

◼ The United States may be held responsible for a taking even when its action is not the final direct cause of the property loss or damage. In such circumstances, however, a taking will be found only if the government's involvement "is sufficiently direct and substantial to require compensation under the Fifth Amendment." *National Bd. of YMCA v. United States*, 395 U.S. 85, 93, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969). *See also Marvel Engineering Co. v. United States*, 14

Cl.Ct. 614, 621 (1988). The Federal Circuit applied this principle in *Shewfelt v. United States*, 104 F.3d 1333, 1337 (Fed.Cir.1997). In that case, real property that had been deeded to the state for non-payment of county taxes was deeded back to the county where the property was located, and then sold to the United States in a prearranged transaction. Under state law, the state's sale of the property to the county extinguished the original owner's redemption rights. Because of inadequate county records, notice of the sale was not provided to the plaintiff in time for him to exercise his redemption rights on all his parcels before they were extinguished. This court held that because the United States was aware of the inadequate county records and the strong likelihood that notice of the sale would not be received, it effectuated a taking of plaintiff's interest in the land when it decided to purchase the land from the county instead of purchasing or condemning the property.

The Federal Circuit reversed, holding that "the United States is not liable for a taking based on its persuasion of the county to obtain the property from the state for resale to the Navy." *Id.* at 1338. By way of explanation, it stated:

> it was California and not the United States that took the action that resulted in the extinguishment of any interest Shewfelt may have had in the tax-deeded lands the Navy purchased from the county. The involvement of the United States in that transaction was not "sufficiently direct and substantial" to make the United States liable for a taking of that interest. If Shewfelt has any valid taking claim resulting from the extinguishment, it would be against California, and not against the United States.

*Id.* The Federal Circuit thus concluded that despite the fact that, pursuant to a prearranged transaction, the United States expected that the state would take the action that produced the injury, the actions of the state and county in extinguishing the owner's interests could not be attributed to the United States for purposes of imposing taking liability. *Id.* at 1337–38.

In reaching this conclusion, the Federal Circuit relied on its prior decision in *Fern v. United States*, 908 F.2d 955 (Fed.Cir.1990). There, retired members of the armed forces claimed that the United States effectuated a taking by enacting a federal statute that overruled a U.S. Supreme Court decision and permitted states to treat military retirement pay as community property, thereby allowing it to be divided between divorcing spouses. In affirming the decision of this court that no taking had occurred, the Federal Circuit opined:

> It is true that Congress expected community property states would be likely to take steps to divide military retired pay between spouses under divorce decrees after [the statute's] enactment .... However, we cannot agree that the award of benefits to Fern's former spouse by the state became an act of the United States because Congress was aware that the community property states could take this action if Congress lifted the bar of preemption.

*Id.* at 959. The Federal Circuit applied a similar analysis in *Erosion Victims of Lake Superior Regulation v. United States*, 833 F.2d 297 (Fed.Cir.1987), wherein it held that the government's successful request to an international commission to raise the water level of Lake Superior did not constitute "direct and substantial" involvement in the commission's decision, so as to give rise to a taking. *See also Langenegger v. United States*, 756 F.2d 1565 (Fed.Cir.1985), *cert. denied*, 474 U.S. 824, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985) (expropriation of plaintiff's property by the El Salvador government pursuant to legislation passed at the prompting of the United States held not a taking by the United States).

 These cases teach that a taking claim will not lie even if the United States knows that its actions will pave the way for another to lose property at the hands of a third party. Applying this rule to the current case leads this court to conclude that although the Treasury likely expected that Norwest would debit Casa's account, that expectation did not make that debiting an act of the Treasury for purposes of the Takings Clause of the Fifth Amendment. It was

Norwest and not the United States that took the action that resulted in the diminishment of the plaintiff's funds and the involvement of the United States in that transaction was not "sufficiently direct and substantial" to make the United States liable for a taking of those funds.[3] Accordingly, Count III of plaintiff's complaint must be dismissed.[4]

## C. Illegal Exaction

In Count II of its complaint, plaintiff alleges that the Treasury's action violated the Fifth Amendment's Due Process Clause, resulting in an illegal exaction. The Federal Circuit has held that this court lacks jurisdiction over claims based on due process violations because, "[a]lthough the Fifth Amendment's due process clause provides that no person shall be deprived of property without due process of law, no language in the clause itself requires the payment of money damages for its violation." *Murray v. United States*, 817 F.2d 1580, 1583 (1987), *cert. denied*, 489 U.S. 1055, 109 S.Ct. 1318, 103 L.Ed.2d 587 (1989). *See also Medina Construction, Ltd. v. United States*, 43 Fed.Cl. 537, 558 (1999) ("This court lacks jurisdiction over causes of action alleging violations of the Fifth Amendment principles of due process or equal protection."); *New York Power Authority v. United States*, 42 Fed.Cl. 795, 801 (1999) (same). However, the courts have reached a different result in so-called "illegal exaction" cases.

Under the Tucker Act, illegal exaction jurisdiction lies where a plaintiff "has paid money over to the Government, directly or in effect," and "seeks return of all or part of that sum arguing" that it "was improperly paid, exacted, or taken from [it] in contravention of the Constitution, a statute, or a regulation." *Eastport S.S. Corp.*, 372 F.2d at 1007–08.[5] In illegal exaction cases, in con-

---

**3.** In arguing to the contrary, plaintiff relies heavily on *Breault v. Heckler*, 763 F.2d 62 (2d Cir.1985). There, surviving spouses challenged, as violative of due process, the government's method of recovering social security payments that were erroneously continued after the beneficiaries' deaths. The Second Circuit held that, under due process, the government could be held liable for the private debiting of the account if it "exercised coercive power" or provided "significant encouragement." *Id.* at 64. It concluded that "[w]here, as here, the Government demands money from a bank in an amount calculated to reflect deposits made in an individual account, knowing full well as it does, so that the bank inevitably will debit that account for the amount so taken," there is sufficient governmental action to support a due process claim. *Id.* at 65. However, the standard employed in *Breault* to define state action is clearly broader than that employed by the Supreme Court and the Federal Circuit in analyzing takings claims. Further, other circuits have concluded that Treasury's action in obtaining payment from a presenting or depository bank does not convert the bank's subsequent debiting of a depositor's account into state action. *See Alnor Check Cashing v. Katz*, 11 F.3d 27, 30 n. 2 (3d Cir.1993) (actions of depository bank in debiting customer's account due to forged Treasury check may not be attributed to the government); *Powderly v. Schweiker*, 704 F.2d 1092, 1099 (9th Cir.1983) (Fletcher, J., concurring) (bank's action cannot "fairly be attributed" to the government); *Dockstader v. Miller*, 719 F.2d 327, 332 (10th Cir.1983) (same), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984).

**4.** Based upon this finding, the court does not reach defendant's argument that plaintiff's loss of funds stemmed from a government-imposed obligation to pay "money," and, as such, is not susceptible to a takings analysis. *But see Eastern Enterprises v. Apfel*, 524 U.S. 498, 542, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (Kennedy, J., concurring) (no taking of money).

**5.** *See United States v. Testan*, 424 U.S. 392, 400–02, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (referencing Court of Claims jurisdiction over claims "for money improperly exacted or retained"); *New York Life Ins. Co. v. United States*, 118 F.3d 1553, 1556 (Fed.Cir.1997), *cert. denied*, 523 U.S. 1094, 118 S.Ct. 1559, 140 L.Ed.2d 792 (1998); *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572–73 (Fed.Cir.1996); *South Puerto Rico Sugar Co. Trading Corp. v. United States*, 167 Ct.Cl. 236, 334 F.2d 622, 626 (1964), *cert. denied*, 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965). *See also* Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3657 at p. 487 (3d ed.1998). As *Eastport's* formulation of this doctrine indicates, illegal exaction jurisdiction clearly exists when the exaction is based on an asserted regulatory power. For example, in *Eversharp, Inc. v. United States*, 129 Ct.Cl. 772, 125 F.Supp. 244, 247 (1954), this court's predecessor held that it had jurisdiction, under the Tucker Act, to consider a monetary claim that the government had illegally exacted money by enforcing a regulation that was contrary to statute. *See also Pan Am World Airways v. United States*, 129 Ct.Cl. 53, 122 F.Supp. 682, 683–84 (1954) ("the collection of money by Government officials, pursuant to an invalid regulation" is an illegal exaction and not a tort). *But cf. United States v. Nederlandsch–Amerikaansche Stoomvart Maatschappij*, 254 U.S.

trast to other actions for money damages, jurisdiction exists even when the Constitutional provision allegedly violated does not contain compensation mandating language. *Bowman v. United States*, 35 Fed.Cl. 397, 401 (1996). For example, in *Mallow v. United States*, 161 Ct.Cl. 446, 1963 WL 8503 (1963), this court's predecessor was faced with a claim by a civilian seeking to recover a fine imposed by a courts-martial that had no jurisdiction over him. In these circumstances, the Court of Claims found that the fine was collected in violation of due process and concluded that "it seems that the plaintiff's claim for the recovery of the money that was taken from him by the Government without due process of law may be properly regarded as one 'founded . . . upon the Constitution,' for purposes of 28 U.S.C. § 1491." 161 Ct.Cl. at 454 (alteration in original). More recently, in *Commonwealth Edison Co. v. United States*, 46 Fed.Cl. 29, 42–43 (2000), appeal docketed, No. 00–5069 (Fed.Cir. Apr. 26, 2000) this court concluded that it had illegal exaction jurisdiction to consider claims that money had illegally been collected by the government pursuant to a provision that allegedly violated due process.[6]

■■■ These decisions demonstrate that this court has jurisdiction to consider whether the alleged violation of the regulations led to an illegal exaction violative of the Due Process Clause, despite the fact that clause does not contain compensation mandating language. But, the foregoing analysis does not resolve completely whether plaintiff's illegal exaction claim is properly stated. Completing that analysis requires the court to consider, in addition, whether such a claim may be legally sustained where the government does not directly obtain funds from plaintiff, but rather takes an action that leads a third party to recoup such funds.

To be sure, the Federal Circuit has held that an illegal exaction claim lies even where money is not paid by the plaintiff directly to the government. Thus, at issue in *Aerolíneas Argentinas v. United States*, 77 F.3d 1564 (Fed.Cir.1996), was whether the Immigration and Naturalization Service's refusal to bear the airline's costs of detaining illegal aliens, who had attempted to enter the country on commercial flights, constituted an illegal exaction. In concluding that such a claim was properly stated, this court's predecessor held that "[t]he amount exacted and paid may be recovered whether the money was paid directly to the government, or was paid to others at the direction of the government to meet a governmental obligation." *Id.* at 1573 (citing *Clapp v. United States*, 127 Ct. Cl. 505, 117 F.Supp. 576, 580, *cert. denied*, 348 U.S. 834, 75 S.Ct. 55, 99 L.Ed. 658 (1954)). Similarly, in *Camellia Apartments, Inc. v. United States*, 167 Ct.Cl. 224, 334 F.2d 667 (1964), cert. denied, 379 U.S. 963, 85 S.Ct. 653, 13 L.Ed.2d 557 (1965), the court held that an illegal exaction claim was stated when the Federal Housing Administration (FHA) required the plaintiffs to pay private mortgagees a charge on behalf of the FHA, allegedly in violation of statute.

■■■ In the instant case, however, the funds in question were neither paid directly to defendant, nor paid to a third party at the direction of defendant, nor even recouped from plaintiff at the direction of the defendant. Rather, they were recouped by a third party, Norwest, pursuant to its deposit contract with plaintiff. Plaintiff presumably could have sued Norwest, claiming that it violated that contract by debiting plaintiff's account and that Norwest instead should have rebuffed the Federal Reserve's attempt to reverse, on an untimely basis, the provisional credit on the Check. In that event, Norwest likely would have interpled the United States, claiming that if it was liable to plaintiff, the Treasury was liable to Norwest for dishonoring the check in violation of its regulations. In this way, plaintiff could have tested whether the Treasury's exercise of authority here was consistent with the re-

148, 41 S.Ct. 72, 65 L.Ed. 193 (1920) (unauthorized coercion of payments by governmental agents is tortious).

6. *See also Doherty v. United States*, 205 Ct.Cl. 34, 500 F.2d 540, 542 (1974) (court had jurisdiction over claim that application of a forfeiture statute that violated equal protection was a taking); *Bowman v. United States*, 35 Fed.Cl. 397, 401 (1996) (illegal exaction jurisdiction lies to consider claims that property had been forfeited in violation of the Double Jeopardy Clause).

quirements of the regulations. But, this did not occur, and plaintiff instead has filed suit directly against the United States, claiming that Treasury's dishonoring of the Check initiated a process that inevitably led to its account being debited. While, for purposes of this motion, the court must presume that Treasury's actions were the genesis of Casa's loss, in the court's view, the illegal exaction doctrine cannot be stretched so far as to encompass plaintiff's claim. Several reasons lead to this conclusion.

First, the jurisdictional hook of the "illegal exaction" doctrine, as described in *Clapp v. United States*, 117 F.Supp. at 580, is not so much that "the Government has the citizen's money in its pocket," but that that money was exacted as a direct result of the application of a statute or a regulation. Only then, according to *Clapp*, may an illegal exaction claim be viewed as founded upon a law or regulation so as to trigger this court's jurisdiction under 28 U.S.C. § 1491. In reaching this conclusion, the court in *Clapp* reviewed various cases, among them *Christie–Street Commission Co. v. United States*, 136 F. 326, 331 (8th Cir.1905), in which the Eighth Circuit held that a claim is founded upon a law if it "conditions and determines its validity." Based upon this extensive review, the Court of Claims concluded that "[o]ur best estimate of the present law is that a claim to recover an illegal exaction made by officials of the Government, which exaction is based upon a power supposedly conferred by a statute, is a claim 'founded upon any Act of Congress.'" *Clapp*, 117 F.Supp. at 580. By comparison, in the instant case, the "exaction" that occurred against Casa was not "based upon a power supposedly conferred by a statute" or regulation, but rather derived from the enforcement of alleged rights under a contract to which the government was not a party.[7] As such, Casa cannot claim that the United States has Casa's funds "in its pocket," at least insofar as that concept is appropriately construed under section 1491.

Second, while the Court of Claims in *Eastport S.S.* recognized that the government

could, "in effect," have the citizen's funds, that concept has never been construed to include a situation in which there was not some form of government compulsion or direction pursuant to a statute or a regulation. *See Clevenger Roofing & Sheet Metal Co. v. United States*, 8 Cl.Ct. 346, 352 n. 6 (1985). *See also Gmo. Niehaus Co. v. United States*, 139 Ct.Cl. 605, 153 F.Supp. 428, 432 (1957). Essentially, plaintiff's claim is that the Treasury set into motion a sequence of events that ultimately resulted in its loss. But, neither Treasury nor the Federal Reserve ordered Norwest to debit plaintiff's account, as might be the case in a tax levy. Rather, Norwest made an independent decision to exercise what it believed were its rights under its deposit contract with Casa. To hold this enough to impose illegal exaction liability on the government would be to open a whole range of new justiciable claims essentially focusing on whether the government proximately caused some third party's injury, thereby adopting a new form of liability primarily based on foreseeability. One can conceive of a garden variety of situations where, for example, the government imposes a cost on an entity, that entity shifts the cost to a third party and the third party might argue the government's action in dealing with the intermediary was unconstitutional or violative of a statute or regulation. While the "injury" to a third party in these circumstances may well be reasonably foreseeable or even occur with the government's full knowledge, that, in this court's view, is no more adequate to impose illegal exaction liability than it is, under the decided case law, to impose liability under the Takings Clause.

This latter point bears a further word of elaboration. Several cases hold that, under the illegal exaction doctrine, a plaintiff may seek the return of the monetary value of property seized or otherwise obtained by the government. *See Bowman*, 35 Fed.Cl. at 401 ("cases such as the instant one—where the Government exacts property which it later sells and for which it receives money—must

---

7. Plaintiff does not allege that it somehow was a third-party beneficiary of an implied contract between the United States and Norwest. Such a claim would face severe hurdles. *See Montana v.*

*United States*, 124 F.3d 1269, 1273 (Fed.Cir. 1997) (describing requirements for third-party beneficiary contract jurisdiction).

necessarily qualify for consideration under the established illegal exaction jurisdiction"); *Bernaugh v. United States,* 38 Fed.Cl. 538, 543 (1997), *aff'd,* 168 F.3d 1319 (Fed.Cir. 1998) (same).[8] Under these decisions, then, a plaintiff who has lost property may, at least in some circumstances, bring either a takings claim or an illegal exaction claim (or both, in the alternative). In the takings context, were such a claim based upon a loss only indirectly caused by the government, the plaintiff would be required to demonstrate under *YMCA, Shewfelt* and *Fern* that the government's involvement was "sufficiently direct and substantial." Were this court to hold that a similar requirement did not apply in the context of an illegal exaction, plaintiffs, in the future, would simply recast their takings claims in illegal exaction terms and thereby avoid the jurisdictional hurdles imposed by the established case law. This court refuses the opportunity to create such a serious incongruity between takings and illegal exaction jurisprudence.

Such an expansion of illegal exaction jurisdiction would not only be inconsistent with the legal rationale underlying that jurisdiction, but would be particularly unwarranted in light of the Supreme Court's repeated admonition that waivers of sovereign immunity "must be 'construed strictly in favor of the sovereign.'" *United States v. Nordic Village, Inc.,* 503 U.S. 30, 34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (quoting *McMahon v. United States,* 342 U.S. 25, 27, 72 S.Ct. 17, 96 L.Ed. 26 (1951)).[9] Indeed, in other contexts, this court and others have been hesitant to find waivers of sovereign immunity where there was no privity between the putative plaintiff and the United States, ordinarily

finding waivers only where the plaintiff was viewed as essentially standing in the shoes of the entity that dealt with the government. Thus, for example, in *First Hartford. Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1293 (Fed.Cir.1999), the Federal Circuit concluded that this court had jurisdiction over a shareholder action alleging a taking because the shareholders "step[ped] into the shoes of the corporation and file[d] suit as fiduciaries on the corporation's behalf and for the corporation's benefit." *See also Slattery v. United States,* 35 Fed.Cl. 180 (1996) (same); *Suess v. United States,* 33 Fed.Cl. 89, 93–94 (1995) (same). Here, Casa in no way stands in the shoes of the presenting bank, Norwest—indeed, for reasons not apparent, Norwest apparently eschewed filing its own lawsuit against the United States to recoup those funds that it could not collect from Casa's overdrawn account. Moreover, in *First Hartford,* the Federal Circuit emphasized that "permitting derivative suits would not extend the jurisdiction of the Court of Federal Claims to a class of claims not previously within its jurisdiction, but rather would permit standing to shareholders to raise a corporation's direct contract claims under a narrow set of circumstances." *First Hartford,* 194 F.3d at 1293. Such is not the case here.

For its part, plaintiff cites two cases in support of its illegal exaction claim. In the first, *ABN Amro Bank N.V. v. United States,* 34 Fed.Cl. 126 (1995), the court was faced with a check cashing scenario which is very analogous to the instant case. The court analyzed various affirmative defenses raised by the United States against a depositing bank that sought to recoup damages

8. *See also Litzenberger v. United States,* 89 F.3d 818, 820 (Fed.Cir.1996) (suggesting that the value of seized property could be recouped as an illegal exaction under the Little Tucker Act); *Gmo. Niehaus Co.,* 153 F.Supp. at 432 (illegal exaction jurisdiction from property seizure). *Compare Crocker v. United States,* 125 F.3d 1475, 1477 (Fed.Cir.1997) (no illegal exaction jurisdiction in the Court of Federal Claims over forfeitures under the Controlled Substance Act because such cases are assigned statutorily to the district courts).

9. *See also Department of the Army v. Blue Fox, Inc.,* 525 U.S. 255, 119 S.Ct. 687, 691, 142

L.Ed.2d 718 (1999) (sovereign immunity is "strictly construed, in terms of its scope, in favor of the sovereign."). This rule appears to have originated in *Schillinger v. United States,* 155 U.S. 163, 166, 30 Ct.Cl. 480, 15 S.Ct. 85, 39 L.Ed. 108 (1894), where the Court stated that "[b]eyond the letter of such consent, the courts may not go, no matter how beneficial they may deem or in fact might be in their possession of a larger jurisdiction over the liabilities of the Government." *See also* John Copeland Nagle, *Waiving Sovereign Immunity in an Age of Clear Statement Rules,* 1995 Wis. L.Rev. 771, 778.

stemming from Treasury's alleged failure to comply with its regulations in dealing with a forged check. The last defense so raised asserted a lack of illegal exaction jurisdiction, to which the court responded:

> Defendant presents an affirmative defense that plaintiff has failed to state a claim upon which relief may be granted. Plaintiff alleges that defendant exacted funds from plaintiff based on a misapplication of Treasury regulations. This court has jurisdiction over such a claim of illegal exaction. *See Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967) (the Tucker Act grants the Court of Federal Claims jurisdiction over a claim that "money or property has been … exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation"). Plaintiff's motion to strike defendant's affirmative defense of failure to state a claim is therefore granted.

*Id.* at 136. This quote constitutes the court's full discussion of this issue and thus the court did not reveal further the rationale for its conclusion that plaintiff's complaint stated a claim. Based on the foregoing analysis, this court, with all due respect, must reject the conclusion reached in *Amro*.

The second case on which plaintiff relies is *Fireman v. United States*, 44 Fed.Cl. 528 (1999). There, the Federal Election Commission (FEC) determined that certain campaign contributions were illegally made. The affected campaign was required to disgorge the funds and elected to pay an amount corresponding to the amount of the contributions to the government, rather than to the original contributors. Invoking the court's illegal exaction jurisdiction, the contributors sued to recover the amount of their contributions from the United States, claiming that the FEC had violated its regulations in holding the contributions illegal. Rejecting the defendant's assertion that plaintiff's complaint failed to state a claim, the court ruled that "under the facts of this case, … government 'coercion' is not required" to a state an

illegal exaction claim. The court gave four reasons for this conclusion, holding that: (i) *Aerolineas Argentinas, supra,* illustrated that the concept of "illegal exaction" is "not strictly construed;" (ii) the government, in effect, had the contributors "money in its pocket;" (iii) there was government compulsion because the FEC had changed its regulations to permit the campaign to make the payment to the government, whereas prior regulations had required illegal contributions to be returned to the donor; and (iv) "as a matter of policy," plaintiffs were entitled to pursue their claim because there was no other way to challenge the FEC's interpretation of its regulations. 44 Fed.Cl. at 536–37.

While admittedly there is some tension between *Fireman* and the analysis herein,[10] it remains that there are several major factual distinctions between that case and the instant case. For example, the court in the *Fireman* case held that there was compulsion and that the FEC's change in its regulations had a "coercive quality to it." 44 Fed. Cl. at 536. Here, by comparison, Norwest neither acted at the government's behest nor pursuant to a statute or a regulation, but rather in its own self-interest, based upon contractual rights. Moreover, in *Fireman,* the court based its decision, in part, on its belief that "as a matter of policy, … the Plaintiffs are entitled to their day in court." 44 Fed.Cl. at 536. Finding that "compelling equities" supported the court's exercise of jurisdiction, the court observed that a contrary ruling would deprive plaintiffs of any relief whatsoever. *Id.* Here, by contrast, the plaintiff could have sued Norwest for breach of its deposit relationship and, in that lawsuit, could have argued that Norwest should not have honored the Federal Reserve's request because it was contrary to the regulations. The fact that such a suit is now likely time-barred does not alter the reality that plaintiff had a remedy, but chose not to pursue it. In these circumstances, unlike perhaps the situation in *Fireman,* "compelling equities" thus do not demand that this court exercise jurisdiction. *Cf. Library of Congress v. Shaw,* 478 U.S. 310, 321, 106

---

**10.** In particular, the court cannot reconcile its view of the cases holding that waivers of sovereign immunity should be narrowly construed with the *Fireman* court's observation that illegal exaction jurisdiction is "not strictly construed."

S.Ct. 2957, 92 L.Ed.2d 250 (1986) ("But policy, no matter how compelling, is insufficient, standing alone, to waive this immunity.").

## III. Conclusion

For the foregoing reasons, Counts I and III of plaintiff's complaint shall be dismissed for lack of jurisdiction. Count II of the complaint shall be dismissed for failure to state a claim.[11]

**IT IS SO ORDERED.**

---

**11.** Based on this conclusion, the court finds it unnecessary to reach defendant's arguments that plaintiff's damages in this case should be limited to the face amount of the Check.