NATIONAL BOARD OF YOUNG MEN'S
CHRISTIAN ASSNS. ET AL. *v.*
UNITED STATES.

No. 517. Argued March 3, 1969.—Decided May 19, 1969.

*Ronald A. Jacks* argued the cause for petitioners. With him on the brief were *Harding A. Orren* and *Sherman L. Cohn.*

*Peter L. Strauss* argued the cause for the United States. With him on the brief were *Solicitor General Griswold, Acting Assistant Attorney General Taylor, Roger P. Marquis,* and *S. Billingsley Hill.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Petitioners brought this suit against the United States in the Court of Claims[1] seeking just compensation under the Fifth Amendment for damages done by rioters to buildings occupied by United States troops during the riots in Panama in January 1964. The Court of Claims held that the actions of the Army did not constitute a "taking" within the meaning of the Fifth Amendment and entered summary judgment for the United States. 184 Ct. Cl. 427, 396 F. 2d 467 (1968). We granted certiorari. 393 U. S. 959 (1968). We affirm.

Petitioners' buildings, the YMCA Building and the Masonic Temple, are situated next to each other on the Atlantic side of the Canal Zone at its boundary with

---

[1] Jurisdiction in the Court of Claims was based upon 28 U. S. C. § 1491.

the Republic of Panama. Rioting began in this part of the Zone at 8 p. m. on January 9, 1964. Between 9:15 and 9:30 p. m., an unruly mob of 1,500 persons marched to the Panama Canal Administration Building, at the center of the Atlantic segment of the Zone and there raised a Panamanian flag. Many members of the mob then proceeded to petitioners' buildings—and to the adjacent Panama Canal Company Office and Storage Building. They entered these buildings, began looting and wrecking the interiors, and started a fire in the YMCA Building.

At 9:50 p. m., Colonel Sachse, the commander of the 4th Battalion, 10th Infantry, of the United States Army, was ordered to move his troops to the Atlantic segment of the Zone with the mission of clearing the rioters from the Zone and sealing the border from further encroachment. The troops entered the three buildings, ejected the rioters, and then were deployed outside of the buildings. The mob began to assault the soldiers with rocks, bricks, plate glass, Molotov cocktails, and intermittent sniper fire. The troops did not return the gunfire but sought to contain the mob with tear gas grenades. By midnight, one soldier had been killed and several had been wounded by bullets; many others had been injured by flying debris. Shortly after midnight, Colonel Sachse moved his troops inside the three buildings so that the men might be better protected from the sniper fire.

The buildings remained under siege throughout the night. On the morning of January 10, the YMCA Building was the subject of a concentrated barrage of Molotov cocktails. The building was set afire, and in the early afternoon the troops were forced to evacuate it and take up positions in the building's parking lot which had been sandbagged during the night. Following the evacuation, the YMCA Building continued to

be a target for Molotov cocktails. The troops also withdrew from the Masonic Temple on the afternoon of January 10, except that a small observation post on the top floor of the building was maintained. The Temple, like the YMCA Building, continued to be under heavy attack following withdrawal of the troops, the greatest damage being suffered on January 12 as a result of extensive fire-bomb activity. The third building under heavy attack in the area—the Panama Canal Company Office and Storage Building—was totally destroyed on January 11 by a fire started by Molotov cocktails.

On January 13, the mob dispersed, and all hostile action in the area ceased. The auditorium-gymnasium in the YMCA Building had been destroyed, and the rest of the building was badly damaged. The Masonic Temple suffered considerably less damage because of its predominantly concrete and brick construction. Other buildings in the Atlantic segment of the Canal Zone were also damaged or destroyed. These buildings were all located along the boundary between the Zone and the Republic of Panama, and none, except the Office and Storage Building, had been occupied by troops during the riot.

Petitioners' suit in the Court of Claims sought compensation for the damage done to their buildings by the rioters after the troops had entered the buildings. The basic facts were stipulated, and all parties moved for summary judgment. The court found it "abundantly clear from the record . . . that the military units dispatched to the Atlantic side of the Zone by General O'Meara were not sent there for the purpose or with the intention of requisitioning or taking [petitioners'] buildings to house soldiers. Both buildings had previously been looted and damaged by the rioters. Colonel Sachse's men were ordered to remove the Panamanians from the buildings in order to prevent further loss or destruction

and then to seal off the border from further incursions by the rioters into the Atlantic portion of the Canal Zone." 184 Ct. Cl., at 438, 396 F. 2d, at 473–474. Accordingly, the court held that "the temporary occupancy of [petitioners'] buildings and the damage inflicted on them by the rioters during such occupancy did not constitute a taking of the buildings for use by the Army within the contemplation of the fifth amendment . . . ." *Id.*, at 438, 396 F. 2d, at 473. The Government's motion for summary judgment was granted, petitioners' motion for summary judgment was denied, and the case was dismissed.

At the outset, we note that although petitioners claim compensation for all the damage which occurred after the troops retreated into the buildings in the early hours of January 10, there was no showing that any damage occurred because of the presence of the troops. To the contrary, the record is clear that buildings which were not occupied by troops were destroyed by rioters, and that petitioners' very buildings were under severe attack before the troops even arrived. Indeed, if the destroyed buildings have any common characteristic, it is not that they were occupied by American soldiers, but that they were on the border and thus readily susceptible to the attacks of the mobs coming from the Republic of Panama. We do not rest our decision on this basis, however, for petitioners would not have a claim for compensation under the Fifth Amendment even if they could show that damage inflicted by rioters occurred because of the presence of the troops.

The Just Compensation Clause was "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong* v. *United States,* 364 U. S. 40, 49 (1960) ; see also *United States* v.

*Sponenbarger,* 308 U. S. 256, 266 (1939).[2]  Petitioners argue that the troops entered their buildings not for the purpose of protecting those buildings but as part of a general defense of the Zone as a whole.  Therefore, petitioners contend, they alone should not be made to bear the cost of the damage to their buildings inflicted by the rioters while the troops were inside.  The stipulated record, however, does not support petitioners' factual premise; rather, it demonstrates that the troops were acting primarily in defense of petitioners' buildings.

The military had made no advance plans to use petitioners' buildings as fortresses in case of a riot.  Nor was the deployment of the troops in the area of petitioners' buildings strategic to a defense of the Zone as a whole.  The simple fact is that the troops were sent to that area because that is where the rioters were.[3]  And once the troops arrived in the area, their every action was designed to protect the buildings under attack.  First, they expelled the rioters from petitioners' buildings and the Office and Storage Building, putting out the fire started by the rioters in the YMCA Building.  Then they stood guard outside to defend the buildings from renewed attack by the 2,000 to 3,000 Panamanian rioters who remained in the area.  In this defense of petitioners' property the troops suffered considerable losses and were forced to retreat into the buildings.

---

[2] For a general discussion of the purposes of the Just Compensation Clause, see Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165 (1967); Sax, Takings and the Police Power, 74 Yale L. J. 36 (1964).

[3] It is significant that at the outset of the rioting Colonel Sachse sent one of his companies—"B" Company—to an area several blocks away from petitioners' buildings.  It was only because "[t]he number of rioters in the 'B' Company area was practically none" that "B" Company was subsequently sent to the area near petitioners' buildings.

It is clear that the mission of the troops forced inside the buildings continued to be the protection of those buildings. In a fact sheet, to which the parties have stipulated, the General Counsel of the United States Department of the Army stated that:

"[T]he troops had occupied the buildings in the YMCA-Masonic Temple vicinity *under instructions to protect the property,* [and] their actions, according to all statements taken, were consistent with instructions. A captain, in his affidavit, states that he was given a message by the battalion commander to convey to the officer who had been placed in charge of the Masonic Temple. The order was, in the captain's words, '. . . that if the rioters attempted to enter the building with the intent to do damage to persons or property that appropriate action . . . could be used. . . .' According to the captain, the order went on to state, '. . . Those people on the 1st floor could assume that rioters forcibly entering the building had the intent to do damage to either property or persons.' The officer in charge received that order, and it was passed along to the men. One sergeant's affidavit names the officer, and recounts receiving the order from him. In the sergeant's own words, *'The building would be defended at all costs.'*

"Other statements by individual soldiers describe actions taken to minimize damage which the rioters were attempting to cause. Several soldiers describe throwing and firing rifle-launched tear gas grenades at rioters who were hurling Molotov cocktails at the buildings. Another describes using similar agents 'to keep the crowd from entering the YMCA,' while still others describe action by themselves or other soldiers in physically routing Panamanians from the YMCA after they had come in through the windows." (Italics supplied.)

Colonel Sachse, the commanding officer in the Atlantic riot area, testified to the same effect:

"The YMCA building was on fire from Molotov cocktails being thrown from the Republic of Panama side into the front of it. We were unable to protect it due to the fact that it is set on the border between the Canal Zone and the Republic of Panama. Therefore we practically lost most of this building by Molotov cocktails."

Thus, there can be no doubt that the United States Army troops were attempting to defend petitioners' buildings. Of course, any protection of private property also serves a broader public purpose. But where, as here, the private party is the particular intended beneficiary of the governmental activity, "fairness and justice" do not require that losses which may result from that activity "be borne by the public as a whole," even though the activity may also be intended incidentally to benefit the public. See *Armstrong* v. *United States, supra,* at 49; *United States* v. *Sponenbarger, supra,* at 266. Were it otherwise, governmental bodies would be liable under the Just Compensation Clause to property owners every time policemen break down the doors of buildings to foil burglars thought to be inside.

Petitioners' claim must fail for yet another reason. On oral argument, petitioners conceded that they would have had no claim had the troops remained outside the buildings, even if such presence would have incited the rioters to do greater damage to the buildings. We agree. But we do not see that petitioners' legal position is improved by the fact that the troops actually did occupy the buildings. Ordinarily, of course, governmental occupation of private property deprives the private owner of his use of the property, and it is this deprivation for which the Constitution requires compensation. See, *e. g., United States* v. *General Motors,* 323 U. S. 373, 378

(1945). There are, however, unusual circumstances in which governmental occupation does not deprive the private owner of any use of his property. For example, the entry by firemen upon burning premises cannot be said to deprive the private owners of any use of the premises. In the instant case, the physical occupation by the troops did not deprive petitioners of any use of their buildings. At the time the troops entered, the riot was already well under way, and petitioners' buildings were already under heavy attack. Throughout the period of occupation, the buildings could not have been used by petitioners in any way. Thus, petitioners could only claim compensation for the increased damage by rioters resulting from the presence of the troops. But such a claim would not seem to depend on whether the troops were positioned in the buildings. Troops standing just outside a building could as well cause increased damage by rioters to that building as troops positioned inside. In either case—and in any case where government action is causally related to private misconduct which leads to property damage—a determination must be made whether the government involvement in the deprivation of private property is sufficiently direct and substantial to require compensation under the Fifth Amendment. The Constitution does not require compensation every time violence aimed against government officers damages private property. Certainly, the Just Compensation Clause could not successfully be invoked in a situation where a rock hurled at a policeman walking his beat happens to damage private property. Similarly, in the instant case, we conclude that the temporary, unplanned occupation of petitioners' buildings in the course of battle does not constitute direct and substantial enough government involvement to warrant compensation under the Fifth Amendment. We have no occasion to decide whether

compensation might be required where the Government in some fashion not present here makes private property a particular target for destruction by private parties.

*Affirmed.*

Mr. Justice Stewart, concurring.

If United States military forces should use a building for their own purposes—as a defense bastion or command post, for example—it seems to me this would be a Fifth Amendment taking, even though the owner himself were not actually deprived of any personal use of the building. Since I do not understand the Court to hold otherwise, I join its judgment and opinion.

Mr. Justice Harlan, concurring in the result.

At the time the military retreated into the YMCA and the Masonic Temple, three alternative courses of action were open to the army commander. First, the troops could have continued their prior strategy and stood their ground in front of the buildings without returning the rioters' hostile sniper fire; second, the troops could have stood their ground and attempted to repel the mob by the use of deadly force; third, the troops could have retreated from the entire area, leaving the mob temporarily in control. The petitioners argue that if the troops had adopted either of the first two of these alternative strategies, their buildings would not have suffered the damage which resulted from the military's occupation.

But what if the military had adopted the third strategy open to it? If the army had completely abandoned the area to the rioters, and regrouped for a later counter-attack, there can be little doubt on this record that the rioters would have subjected the buildings to greater damage than that which was in fact suffered. I believe this fact to be decisive. For it appears to me that, in riot control situations, the Just Compensation Clause

may only be properly invoked when the military had reason to believe that its action placed the property in question in greater peril than if *no* form of protection had been provided at all.

## I.

I start from the premise that, generally speaking, the Government's complete failure to provide police protection to a particular property owner on a single occasion does not amount to a "taking" within the meaning of the Fifth Amendment. Every man who is robbed on the street cannot demand compensation from the Government on the ground that the Fifth Amendment requires fully effective police protection at all times. The petitioners do not, of course, argue otherwise. Yet surely the Government may not be required to guarantee fully effective protection during serious civil disturbances when it is apparent that the police and the military are unable to defend all the property which is threatened by the mob. If the owners of *unprotected* property remain uncompensated, however, there seems little justice in compensating petitioners, who merely contend that the military occupation of their buildings provided them with *inadequate* protection.

Petitioners' claim that they may recover on a bare showing that they were afforded "inadequate" protection has an additional defect which should be noted. If courts were required to consider whether the military or police protection afforded a particular property owner was "adequate," they would be required to make judgments which are best left to officials directly responsible to the electorate. In the present case, for example, petitioners could argue that it was possible for the troops to maintain their position in front of the buildings if they had been willing to kill a large number of rioters. In rebuttal, the Government could persuasively argue that the indiscriminate use of deadly force would have en-

raged the mob still further and would have increased the likelihood of future disturbances. Which strategy is a court to accept? Clearly, it is far sounder to defer to the other duly constituted branches of government in this regard.

It is, then, both unfair and unwise to favor those who have obtained some form of police protection over those who have received none at all. It is only if the military or other protective action foreseeably *increased* the risk of damage that compensation should be required. Since, in the present case, the military reasonably believed that petitioners' property was better protected if the troops retreated into the buildings, rather than from the entire area, the property owners have no claim to compensation on the ground that the protection afforded to them was "inadequate."

I must emphasize, however, that the test I have advanced should be applied only to government actions taken in an effort to control a riot. The Army could not, for example, appropriate the YMCA today and claim that no payment was due because the building would have been completely demolished if the military had not intervened during the riot. Once tranquility has been restored, property owners may legitimately expect that the Government will not deprive them of the property saved from the mob. But while the rioters are surging through the streets out of control, everyone must recognize that the Government cannot protect all property all of the time. I think it appropriate to say, however, that our decision today does not in any way suggest that the victims of civil disturbances are undeserving of relief. But it is for the Congress, not this Court, to decide the extent to which those injured in the riot should be compensated, regardless of the extent to which the police or military attempted to protect the particular property which each individual owns.

## II.

While I agree with the Court that no compensation is constitutionally available under the facts of this case, I have thought it appropriate to state my own views on this matter since the precise meaning of the rules the majority announces remains obscure at certain critical points. Moreover, in deciding this particular case we should spare no effort to search for principles that seem best calculated to fit others that may arise before American democracy once again regains its equilibrium.

The Court sets out two tests to govern the application of the Just Compensation Clause in riot situations. It first denies petitioners recovery on the ground that each was the "particular intended beneficiary" of the Government's military operations. *Ante,* at 92. I do not disagree with this formula if it means that the Fifth Amendment does not apply whenever the policing power reasonably believes that its actions will not increase the risk of riot damage beyond that borne by the owners of unprotected buildings. But the language the Court has chosen leaves a good deal of ambiguity as to its scope. If, for example, the military deliberately destroyed a building so as to prevent rioters from looting its contents and burning it to the ground, it would be difficult indeed to call the building's owner the "particular intended beneficiary" of the Government's action. Nevertheless, if the military reasonably believed that the rioters would have burned the building anyway, recovery should be denied for the same reasons it is properly denied in the case before us. Cf. *United States* v. *Caltex, Inc.,* 344 U. S. 149 (1952).

Moreover, the Court's formula might be taken to indicate that if the military's *subjective* intention was to protect the building, the courts need not consider whether this subjective belief was a reasonable one.

While the widest leeway must, of course, be given to good-faith military judgment, I am not prepared to subscribe to judicial abnegation to this extent. If a court concludes, upon convincing evidence, that the military had good reason to know that its actions would significantly increase the risk of riot damage to a particular property, compensation should be awarded regardless of governmental good faith.

While I accept the Court's "intended beneficiary" test with these caveats, I cannot subscribe to the second ground the majority advances to deny recovery in the present case. The majority analogizes this case to one in which the military simply posted a guard in front of petitioners' properties. It is said that if the rioters had damaged the buildings as a part of their attack on the troops standing in front of them, the property damage caused would be too "indirect" a consequence of the military's action to warrant awarding Fifth Amendment compensation. It follows, says the Court, that even if the military's occupation of the buildings *increased* the risk of harm far beyond any alternative military strategy, the Army's action is nevertheless too "indirect" a cause of the resulting damage.

This argument, however, ignores a salient difference between the case the Court hypothesizes and the one which we confront. If the troops had remained on the street, they would not have obtained any special benefit from the use of petitioners' buildings. In contrast, the military did in this instance receive a benefit not enjoyed by members of the general public when the troops were ordered to occupy the YMCA and the Masonic Temple. As the Court's statement of the facts makes clear, the troops retreated into the buildings to protect themselves from sniper fire. Ordinarily, the Government pays for private property used to shelter its officials,

and I would see no reason to make an exception here *if* the military had reason to know that the buildings would have been exposed to a lesser risk of harm if they had been left entirely unprotected.

On the premises set forth in this opinion, I concur in the judgment of the Court.

Mr. Justice Black, with whom Mr. Justice Douglas joins, dissenting.

The Court says that: "Shortly after midnight, Colonel Sachse moved his troops inside the three buildings [which included the two buildings for which compensation is here sought] so that the men might be better protected from the sniper fire." *Ante,* at 87. The Army selected those two buildings to protect itself while carrying out its mission of safeguarding the entire zone from the rioters. Thus, the Army made the two buildings the particular targets of the rioters and the buildings suffered heavy damage. The Army's action was taken not to save the buildings but to use them as a shelter and fortress from which, as the Court of Claims found, "to seal off the border from further incursions by the rioters into the Atlantic portion of the Canal Zone." 184 Ct. Cl. 427, 438, 396 F. 2d 467, 474 (1968). At that time, I think it can hardly be said that these private buildings were taken for the good of the owners. Instead, the taking by the Army was for the benefit of the public generally. I still feel that "the guiding principle should be this: Whenever the Government determines that one person's property—whatever it may be—is essential to the war effort and appropriates it for the common good, the public purse, rather than the individual, should bear the loss." *United States* v. *Caltex, Inc.,* 344 U. S. 149, 156 (1952) (dissenting opinion of Mr. Justice Douglas).