CASA DE CAMBIO COMDIV S.A.,
DE C.V., Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 01–5042.

United States Court of Appeals,
Federal Circuit.

May 29, 2002.

Robert Ehrenbard Kelley Drye & Warren LLP, of Washington, DC, argued for plaintiff-appellant. On the brief was Thomas C. Jackson.

Doris S. Finnerman, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With her in the brief were Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; and Mark A. Melnick, Assistant Director. Of counsel on the brief were Rhonda Kent, and Tricia Long, Attorneys, Office of Chief Counsel, Financial Management Service, Department of the Treasury, of Washington, DC.

Before CLEVENGER, Circuit Judge, ARCHER, Senior Circuit Judge, and DYK, Circuit Judge.

DYK, Circuit Judge.

Casa de Cambio Comdiv S.A. de C.V. ("Casa") appeals from an order of the Court of Federal Claims dismissing Casa's complaint. *Casa de Cambio Comdiv S.A. de C.V. v. United States*, 48 Fed. Cl. 137 (2000). Casa cashed a stolen United States Treasury check and deposited the check in its account with non-party Norwest Bank Minnesota, N.A. ("Norwest"), which, in turn, presented the check for payment by the Treasury. The Treasury, after discovering that the check was stolen, recouped the amount by debiting Norwest's account, after which Norwest debited Casa's account with Norwest. Casa's complaint alleged that the government illegally exacted money from Casa in violation of federal regulations. Casa's complaint also alleged the government's action amounted to a taking and violation of the Due Process clause of the Fifth Amendment. Because the Court of Federal Claims properly dismissed the complaint, we affirm.

## BACKGROUND

Casa's complaint is based on the following factual allegations.

Casa is engaged in the business of international currency exchange, has its principal place of business in Mexico City, and is incorporated in Mexico. On October 29, 1993, Genaro Alvarez ("Alvarez") presented to Casa a check drawn on the United States Treasury in the amount of $1,165,000. The check was made out to Alvarez as the payee. Unbeknownst to Casa the check had been stolen. Apparently the check listed no payee at the time it was stolen, and Alvarez's name was later filled in. Casa gave value for the check and forwarded it to Norwest, Casa's banker in the United States, for deposit and collection. On November 1, 1993, Norwest forwarded the check to the Federal Reserve Bank of Minnesota for collection. On November 4, 1993, the Federal Reserve Bank debited the Treasury account and gave immediate credit for the check to Norwest. There is no allegation that the drawer's signature was forged.

On November 17, 1993, the Treasury was informed that a number of checks had been stolen from the United States Postal Data Service Center in St. Louis, Missouri, including a check bearing the same serial number as the check cashed by Alvarez. However, it was not until February 1, 1994, that the Treasury directed the Fed-

eral Reserve Bank to credit the full amount of the check to its account, acting pursuant to 31 C.F.R. 240.3(c), which provides: "The Treasury shall have the usual right of a drawee to examine checks presented for payment and refuse payment of any checks. The Treasury shall have a reasonable time to make such examination." 31 C.F.R. § 240.3(c) (2001). The Federal Reserve Bank did so on that same day and debited Norwest's account with the Federal Reserve Bank for the full amount of the check. Norwest then debited the full amount of the check from Casa's account with Norwest. Norwest's debiting of Casa's account caused Casa's account to be overdrawn by $659,665.63 on February 2, 1994.

On October 29, 1999, Casa filed suit against the United States in the Court of Federal Claims. Casa sought to recover on three separate theories. Count I alleged that the government did not reject payment on the check within a "reasonable time," in violation of 31 C.F.R. § 240.3(c), (d). Count II alleged an illegal exaction without due process in violation of the Fifth Amendment. Count III alleged the government had taken Casa's property without just compensation as guaranteed by the Fifth Amendment. Casa sought to recover damages for the value of the check, the loss of use of funds, expenses incurred due to the overdraft in Casa's account with Norwest, legal fees and expenses, and the diminished value of its business due to a decline in Casa's reputation as a result of its overdrawn account with Norwest.

In a well-reasoned opinion the Court of Federal Claims dismissed count I for lack of jurisdiction holding that, even if the government had violated 31 C.F.R. Part 240, those regulations were "directed only at protecting the Treasury's rights, rather than those of third parties .... [and] nothing in the language of the regulation[s]

unequivocally grants a depositor in [Casa's] position a right to recover damages either 'expressly or by implication.' " *Casa*, 48 Fed. Cl. at 141 (internal citations omitted). The court dismissed count II (the Due Process claim) for failure to state a claim because the government had not required Casa to pay any money either to the government or to a third party. "Rather, [the funds] were recouped by a third party, Norwest, pursuant to its deposit contract with [Casa]." *Id.* at 144. The Court of Federal Claims similarly dismissed count III (the Takings claim) for lack of jurisdiction because "[i]t was Norwest and not the United States that took the action that resulted in the diminishment of [Casa's] funds and the involvement of the United States in that transaction was not 'sufficiently direct and substantial' to make the United States liable for a taking of those funds." *Id.* at 142–43 (quoting *Nat'l Bd. of YMCA v. United States*, 395 U.S. 85, 93, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969) ("YMCA")).

Casa filed this timely appeal. We have jurisdiction pursuant to 28 U.S.C § 1295(a)(3).

## DISCUSSION

### I

■ This court reviews decisions of the Court of Federal Claims involving questions of jurisdiction and the failure to state a claim upon which relief can be granted without deference. *Kanemoto v. Reno*, 41 F.3d 641, 643 (Fed.Cir.1994); *Shelden v. United States*, 7 F.3d 1022, 1026 (Fed.Cir. 1993). We review the Court of Federal Claims's interpretation of the constitution, statutes, and regulations without deference. *City of Tacoma v. Richardson*, 163 F.3d 1337, 1339 (Fed.Cir.1998).

## II

Initially, it is useful to place the appellant's claims in context. Disputes concerning the legal rules governing the present fact situation or similar situations are not uncommon. Indeed, though one would not know it from the briefs, a similar factual situation led to the leading Supreme Court decision on federal common law *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). Typically, where a check has been stolen and the payee's endorsement has been added or forged, the dispute is between the Treasury and the bank that presented the check for payment. In *Clearfield Trust*, a Treasury check with a forged payee endorsement was tendered to the J.C. Penney Co. ("J.C.Penney") by someone who was not the payee of the check. 310 U.S. at 364, 60 S.Ct. 968. J.C. Penney cashed the check and endorsed it over to Clearfield Trust, which paid J.C. Penney. *Id.* at 365, 60 S.Ct. 968. Clearfield Trust then presented the check to the Federal Reserve Bank of Philadelphia, which paid Clearfield Trust. *Id.* Twelve days later the payee told the United States that he had never received the check. *Id.* The United States then informed Clearfield Trust and J.C. Penney of the forgery and, sixteen months after the check was cashed, informed Clearfield Trust that it sought reimbursement for the amount of the check. *Id.* The United States subsequently brought suit against Clearfield Trust to reclaim the amount of the check. *Id.* Clearfield defended on the ground that the United States had unreasonably delayed in seeking to recoup the amount of the check. *Id.* at 366, 60 S.Ct. 968. The Supreme Court held that the rights and obligations between Clearfield and the United States were to be determined under federal common law because they related to commercial paper issued by the United States. *Id.*

On the merits in *Clearfield Trust*, the Supreme Court held that the government was not liable to Clearfield Trust because Clearfield Trust could "shift that loss to the drawee [the Treasury] only on a clear showing that the drawee's delay in notifying [it] of the forgery caused [it] damage." *Id.* at 370, 63 S.Ct. 573. The Supreme Court concluded that such damage had not been shown by Clearfield Trust, "who so far as appears can still recover from J.C. Penney Co." *Id.* The Court distinguished *Price v. Neal*, 3 Burr. 1354, 97 Eng. Rep. 871 (1762) as involving the situation of a forgery of the drawer's signature, in which the drawee is charged with immediate knowledge of the forgery, while *Clearfield Trust* involved the situation of a forgery of the payee's signature, knowledge of which the drawee could not be immediately charged. *Id.* at 369, 63 S.Ct. 573. Thirteen years later, when addressing a related factual situation involving a dispute between private parties, the Supreme Court clarified that the rights and obligations between the private parties (*e.g.*, J.C. Penney and Clearfield Trust, or Casa and Norwest) are generally determined under state law because they do "not touch the rights and duties of the United States." *Bank of Am. Nat'l Trust & Sav. Ass'n v. Parnell*, 352 U.S. 29, 33, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956).

Although *Clearfield Trust* was a case in which the United States brought suit against the presenting bank, it is indeed difficult to believe that, where a debit has occurred, making affirmative legal action by the United States unnecessary, the presenting bank (here, Norwest) is without legal recourse against the United States. Whether the claim is properly characterized as based on a contract, an implied contract, the Treasury regulations, or some other theory, we assume that a claim for an unreasonable delay in notification may properly be brought against the Unit-

ed States, and the case will be governed by the federal common law established in *Clearfield Trust,* as modified by the Treasury regulations. *See United States v. Texas,* 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993).

This case, however, is unusual in that the depositer in the *Clearfield Trust* situation (Casa here, and J.C. Penney in *Clearfield Trust*) rather than the presenting bank (Norwest here, and Clearfield Trust in *Clearfield Trust*) seeks to assert rights against the United States. *Clearfield Trust* appears to assume that the United States would have no direct rights against the depositer, and that the depositer would have no direct claim against the Treasury. Instead, the depositer would have a claim against its own bank, and, presumably, under *Parnell,* that claim would be governed largely by state law. We find nothing in appellant's authorities that suggests a different result, or any pertinent constitutional infirmity in the regulatory process.

### III

■ A claim against the United States may be based on a theory that a statute or regulation is money-mandating as to the plaintiff. In *United States v. Testan,* 424 U.S. 392, 401–02, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), the Supreme Court held that

> [w]here the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim whether it be the Constitution, a statute, or a regulation does not create a cause of action for money damages, unless . . . that basis "in itself can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained."

(citation omitted). In *Collins v. United States,* we held that because "the Tucker Act does not mandate the payment of plaintiff's alleged damages, to recover he

must base his claim on some other statute that creates a substantive right by mandating the payment of his claim. The statute relied upon must grant a right of action with specificity." 67 F.3d 284, 286 (Fed.Cir.1995) (citing *Testan,* 424 U.S. at 400, 96 S.Ct. 948). In *Collins,* we held that a statute stating that the government "may settle, and pay in the amount not more than $ 100,000, a claim against the United States" was not money-mandating, because the payment of the claim was discretionary under the statute. *Id.*

■ Here, Casa urges that the Treasury regulations, 31 C.F.R. § 240.3(c), (d), may be fairly interpreted as mandating compensation by the government. The regulations provide that "[t]he Treasury shall have the usual right of a drawee to examine checks presented for payment and refuse payment of any checks. The Treasury shall have a reasonable time to make such examination," 31 C.F.R. § 240.3(c) (2001), and "[c]hecks shall be deemed to be paid by the United States Treasury only after first examination has been fully completed," 31 C.F.R. § 240.3(d). Casa urges that the Treasury's three-month delay before refusing payment of the check exceeded a reasonable time, such that the check should have been deemed paid according to 31 C.F.R § 240.3(d). Casa argues that once the check was deemed paid the Treasury could not refuse payment under 31 C.F.R. § 240.3(d), but would only be authorized to seek reclamation of the funds already paid and would have to follow the reclamation procedures under 31 C.F.R. §§ 240.6, 240.7. The reclamation procedures 31 C.F.R. §§ 240.6, 240.7 (2001), require that the Treasury provide the presenting bank with notice of its intent to reclaim the funds and an opportunity to protest the reclamation. Section 240.6 provides:

(a) If, after a check has been paid by Treasury, it is found to:

(1) Bear a forged or unauthorized indorsement; or

(2) Contain any other material defect or alteration which was not discovered upon first examination, then, upon demand by the Treasury in accordance with the procedures specified in § 240.7 of this part, the presenting bank or other indorser shall refund the amount of the check payment.

Section 240.7(a) provides that "[f]or all reclamations an initial demand for refund of the amount of a check payment will be made by sending a 'Request for Refund (Reclamation),' to the presenting bank or any other indorser. This Request shall advise the presenting bank of the amount demanded and the reason for the demand." Section 240.7 further provides that "the bank may, by filing a protest, request Treasury to review its decision that the bank is liable for the reclamation . . . . The Director, . . . who has supervisory authority over the Reclamation Branch, or his authorized subordinate, shall consider and decide any protest properly submitted under this paragraph." 31 C.F.R. §§ 240.7(a)(3), 240.7(c)(1) (2001). Thus, unlike refusals to pay under section 240.3, when operating under sections 240.6, 240.7, the Treasury must provide the presenting bank with notice of and an opportunity to protest the intended reclamation. The benefit to Casa from the Treasury's following this alternative is not entirely clear. Presumably, had the Treasury followed this alternative, an unexpected overdraft in Casa's account with Norwest would not have occurred.

However, even if we were to accept Casa's theory, the regulations would only apply to claims against the government by Norwest. Casa's theory does not explain how the regulations could be construed as being money-mandating as to Casa, even if they were money-mandating as to Norwest. We hold that the regulations are not money-mandating as to Casa since there is no indication that they were designed to convey rights on depositers of presenting banks.

IV

We next address Casa's claim that the Court of Federal Claims erred in dismissing the Takings Clause count of its complaint. Casa does not argue that the government appropriated Casa's property directly or that the government directly imposed regulatory burdens on Casa that amounted to a taking. Rather, Casa argues that the government committed a regulatory taking when it caused Norwest (a private party) to take Casa's property when the government debited Norwest's account. Casa urges that Norwest's debiting of Casa's account as a result of the government's action against Norwest amounted to a taking of Casa's property by the government.

■ Under decisions of the Supreme Court and this court, a compensable taking does not occur unless the government's actions on the intermediate third party have a "direct and substantial" impact on the plaintiff asserting the takings claim. A variety of cases have held that particular government actions did not have such a direct and substantial effect on the plaintiff and thus did not constitute a taking of property from the plaintiff.

In *YMCA*, the YMCA brought suit against the government, alleging that a compensable taking of property by the government occurred when rioters damaged or destroyed YMCA buildings in Panama, some of which were occupied by U.S. troops. The Supreme Court noted that the YMCA had made no showing that any damage occurred as a result of the presence of the troops. 395 U.S. at 89, 89

S.Ct. 1511. Moreover, the YMCA "would not have a claim for compensation under the Fifth Amendment even if [it] could show that damage inflicted by rioters occurred because of the presence of the troops." *Id.,* 395 U.S. at 89, 89 S.Ct. 1511. The Court held that the Constitution does not require compensation every time violence against the government results in damage to private property, and that compensation to the YMCA was not required in that case because the government's involvement in the causation of the damage did "not constitute direct and substantial enough government involvement to warrant compensation under the Fifth Amendment." *Id.* at 93, 89 S.Ct. 1511.

In each case in which we have applied the *YMCA* standard, we held that the government's involvement was not sufficiently "direct and substantial" to constitute a taking. *See Shewfelt v. United States,* 104 F.3d 1333, 1337 (Fed.Cir.1997) (although county may have improperly taken title to property and United States government was aware of potential taking when it acquired property through purchase from county, acts of the county were not attributable to the United States, and the United States was not obligated to compensate owner); *Erosion Victims of Lake Superior Regulation v. United States,* 833 F.2d 297, 301 (Fed.Cir.1987) (no "direct and substantial involvement" by the United States where international organization exercised its own discretion to raise water levels of lake causing damage to landowners' property); *Langenegger v. United States,* 756 F.2d 1565, 1572 (Fed.Cir.1985) (where actual expropriation by foreign sovereign occurred, there was no Fifth Amendment taking by United States even though the United States engaged in "friendly" persuasion of the foreign sovereign to engage in the expropriation), *cert. denied,* 474 U.S. 824, 106 S.Ct. 78, 88 L.Ed.2d 64, (1985); *see also Griggs v. Allegheny County,* 369 U.S. 84, 89, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962) (county government, not federal government, was liable for taking of air easement over claimant's property for use by county airport, even though airport was funded in part by a federal grant based on compliance with federal regulations). Finally, in *B & G Enterprises, Ltd. v. United States,* 220 F.3d 1318 (Fed.Cir.2000), *cert. denied,* 531 U.S. 1144, 121 S.Ct. 1079, 148 L.Ed.2d 956 (2001), we held that the United States was not liable for a regulatory taking when a cigarette vending machine company lost business as a result of a California law restricting the lawful use of such machines. The United States had conditioned California's receipt of a block grant from the Department of Health and Human Services on the passage of such a law. *Id.* at 1321. We held that "California did not act as an agent of the United States by enacting the ... vending machine restrictions and that the United States is therefore not responsible for that law's interference with [the claimant's] vending machine contracts ...." *Id.* at 1323.

In only one case, from our predecessor court, *Turney v. United States,* 126 Ct.Cl. 202, 115 F.Supp. 457 (1953), did we find the government's action towards a third-party to have a direct and substantial enough effect on the plaintiff to require compensation under the Takings Clause. *Turney* involved an embargo enacted by the Philippine government in 1947. Following the founding of the Republic of the Philippines just after World War II, the United States had conveyed to the Philippines certain surplus military supplies located at the Leyte Air Depot. *Id.* at 458. After the surplus was sold, it was discovered that classified radar equipment was among the surplus property that had been sold, and the United States notified the buyer that it would repossess the radar equipment by negotiation or seizure with the aid of the Philippine government. *Id.*

at 459. The involvement of the Philippines was necessary "because the materials were located on soil under the sovereignty of the Philippine Government," rather than on a United States military base subject to United States sovereignty. *Id.* When negotiations failed, the Philippines, "at the suggestion of representatives of the United States, . . . placed an embargo upon the exportation" of the radar equipment. *Id.* at 460. Ultimately, the United States Air Force took possession of the radar equipment from the buyer in exchange for a receipt for the equipment and a reservation of the right to sue for value. *Id.* at 464. We found that a taking had occurred and reasoned:

> The relations, at the time, between our Government and the Philippine Government, were close. Our armed forces had just liberated the Philippines from the Japanese. Our Government had given one hundred million dollars worth of surplus property to the Philippines, including the property at the Leyte Air Depot, and had sold the property for the account of the Philippine Government. When we requested that Government to place an embargo upon the exportation of any of the property, it, naturally, readily complied. We think that the taking occurred . . . when the Army officially took possession of the property.

*Id.* at 463–64.

We distinguished *Turney* in *Langenegger*, 756 F.2d 1565. In *Langenegger*, the plaintiff sought compensation from the United States for the expropriation of its coffee plantation located in El Salvador by the Salvadoran government as a result of agrarian reforms enacted in the country. The plaintiff alleged that the United States was responsible for the expropriation because the United States government tied military and economic assistance to El Salvador to the implementation of agrarian reform by the Salvadoran government. *Id.* at 1567. We reiterated the applicabili-

ty of the *Turney* standard, focusing on whether the United States's involvement was sufficiently direct and substantial to warrant its responsibility under the Fifth Amendment, but found that Langenegger's claim was factually distinguishable from the situation in *Turney*. *Id.* at 1572. We held that

> Where the actual expropriation is by the hand of a foreign sovereign, the United States cannot be held responsible merely because its activity is that of "friendly" persuasion regarding general policy, common among allies, or when the sole benefit to the United States is the political stability of its neighbors. Diplomatic persuasion among allies is a common occurrence, and as a matter of law, cannot be deemed sufficiently irresistible to warrant a finding of direct and substantial involvement, however difficult refusal may be as a practical matter.

*Id.* at 1572.

■ Because the government did not direct Norwest to take action against Casa, and because Norwest did not act as the alter ego or agent of the government, Casa has not stated a claim for relief under the Takings Clause.

## V

■ Our cases have established that there is no jurisdiction under the Tucker Act over a Due Process claim unless it constitutes an illegal exaction. *Murray v. United States*, 817 F.2d 1580, 1583 (Fed. Cir.1987), *cert. denied*, 489 U.S. 1055, 109 S.Ct. 1318, 103 L.Ed.2d 587 (1989); *Inupiat Comy. of the Arctic Slope v. United States*, 230 Ct.Cl. 647, 680 F.2d 122, 132 (1982), *cert. denied*, 459 U.S. 969, 103 S.Ct. 299, 74 L.Ed.2d 281 (1982). An illegal exaction under the Due Process clause exists only if money has been "improperly exacted or retained" by the government. *Testan*, 424 U.S. at 401, 96 S.Ct. 948.

Citing *Aerolineas Argentinas v. United States,* 77 F.3d 1564 (Fed.Cir.1996), Casa urges that an "illegal exaction claim lies even where money is not paid by the plaintiff directly to the government." Appellant's Br. at 19. In *Aerolineas,* the Immigration and Naturalization Service ("INS") refused to bear the costs of detaining illegal aliens who had arrived in the United States on the plaintiff's commercial flights as required by statute and instead required the plaintiff to bear these costs. 77 F.3d at 1568. We held that because the INS compelled the airlines to bear costs that the government had a legal duty to bear, the plaintiffs had alleged facts to state a claim for an illegal exaction of money by the government. *Id.* at 1574. Specifically, we held that if the airlines "made payments that by law the [INS] was obliged to make, the government has 'in its pocket' money corresponding to the payments that were the government's statutory obligation. Suit can be maintained under the Tucker Act for recovery of the money illegally required to be paid on behalf of the government." *Id.* at 1573–74.

Likewise, in *Camellia Apartments, Inc. v. United States,* 167 Ct.Cl. 224, 334 F.2d 667, 669 (1964), *cert. denied,* 379 U.S. 963, 85 S.Ct. 653, 13 L.Ed.2d 557 (1965) Federal Housing Administration ("FHA") regulations required the plaintiff-apartment owners, who had originally financed the construction of their apartments through FHA-insured mortgages, to pay a prepayment charge upon refinancing their properties under conventional non-FHA-insured mortgages. The new mortgagees collected the prepayment charges and transmitted them to the FHA. We held that the plaintiffs had stated a claim for an illegal exaction because the new mortgagees were required by FHA regulations to collect the payments and remit them to the FHA, and under such circumstances the government could not "seriously deny plaintiffs' allegation that the mortgagees acted solely as the FHA's agents . . . ." *Id.* at 669.

■ These decisions do not bear Casa's broad interpretation, but only echo the standard in the Takings Clause context that a plaintiff has a claim for an illegal exaction only where the government has direct and substantial impact on the plaintiff asserting the claim. We conclude that this test is identical to the Takings test, and again that no such direct action by the United States is alleged here. The Court of Federal Claims properly dismissed this claim as well.[1]

### VI

The rejection of plaintiff's claims is also supported by a number of court of appeals cases rejecting nearly identical claims. In *Alnor Check Cashing v. Katz,* 11 F.3d 27 (3d Cir.1993), Alnor cashed a Treasury check presented by Katz and made out to Katz's former employer. Alnor deposited the check in its account at the Philadelphia Savings Fund Society ("PSFS"), which apparently presented the check to a Federal Reserve Bank. *Id.* at 29. When the Treasury discovered the fraud, it sought reimbursement for the amount of the check from PSFS. *Id.* PSFS paid the government and debited Alnor's account. *Id.* Alnor brought suit alleging that the United States had wrongfully dishonored the Treasury check in violation of federal com-

---

1. Casa also argues that the Court of Federal Claims erred by not following certain prior decisions of that court. *See, e.g., ABN Amro Bank N.V. v. United States,* 34 Fed. Cl. 126 (1995); *Fireman v. United States,* 44 Fed. Cl. 528 (1999). However, this is not a ground for appeal to this court, because prior decisions of the Court of Federal Claims are not binding either on this court or the Court of Federal Claims. *West Coast Gen. Corp. v. Dalton,* 39 F.3d 312, 315 (Fed.Cir.1994).

mon law and regulations. *Id.* The Third Circuit held that because Katz's endorsement of the check was unauthorized within the meaning of the Treasury regulations, the United States was entitled to a refund from PSFS, and "[t]herefore the government's reclamation of the value of the check from PSFS did not wrongfully interfere with Alnor's contractual rights." *Id.* at 30–31.

In *Dockstader v. Miller*, 719 F.2d 327 (10th Cir.1983), the Social Security Administration ("SSA") had inadvertently directly deposited in Dockstader's bank account amounts representing benefits to Dockstader's deceased husband. *Id.* at 328. When the government learned of the erroneous payments, the Treasury contacted the bank and sought a refund. *Id.* The bank made a refund to the Treasury and debited Dockstader's account without notifying her. *Id.* Dockstader brought suit against the government, alleging a violation of the Due Process clause. *Id.* at 329. The Tenth Circuit held that the bank's debiting of Dockstader's account "may not fairly be attributed to Treasury." *Id.* at 332 (citation omitted).

The facts in *Powderly v. Schweiker*, 704 F.2d 1092 (9th Cir.1983), were similar to those in *Dockstader.* Powderly's husband died but continued to receive SSA benefit checks, which Powderly deposited in her bank account. *Id.* at 1094. When the SSA discovered this, it recouped the value of the benefits from Powderly's bank, which then debited Powderly's account. *Id.* Powderly brought suit against the government, alleging a violation of Due Process. *Id.* The Ninth Circuit rejected Powderly's claim. *Id.* In a concurring opinion, Judge Fletcher explained that if the government had debited Powderly's account, she would have a Due Process claim, but, because it was the private bank and not the government that debited the account, "no process was due from the government

...." *Id.* at 1099 (Fletcher, J., concurring). Further, Judge Fletcher explained:

> Nor can the actions of [the bank] in debiting Powderly's account be imputed to the federal government on some theory of agency. Sea–First's ability to debit appellant's account in the amount of the forged check derives not from some delegation of federal authority to the bank by the Treasury but from appellant's own depository contract with the bank and the self-help remedies authorized by Washington state law governing the relationship between financial organizations and their customers. Wash. Rev.Code Ann. § 62A.4–103 (1981); see *Conner v. First National Bank of Sedro–Woolley*, 113 Wash. 662, 665–66, 194 P. 562, 563 (1921); *Allied Sheet Metal Fabricators, Inc. v. Peoples National Bank of Washington*, 10 Wash.App. 530, 537–38, 518 P.2d 734, 739, *aff'd,* 83 Wash.2d 1013, *cert. denied,* 419 U.S. 967, 95 S.Ct. 231, 42 L.Ed.2d 183 (1974). Indeed, absent the sort of contractual arrangement under state law present here, a presenting bank could quite conceivably be unable to recover by debit a sum paid to a depositor on a check with an unauthorized endorsement, even though the Treasury, pursuant to federal law, is able to secure a refund from the bank. Thus, the bank in no way can be viewed as acting as the agent of the Treasury, since its rights of recovery against appellant are neither defined nor created by federal law.

*Id.* at 1099.

The sole contrary case is the Second Circuit decision in *Breault v. Heckler*, 763 F.2d 62 (2d Cir.1985). There, on facts again similar to those in *Dockstader* and *Powderly,* widows who had deposited SSA benefit checks payable to their deceased husbands brought suit against the government alleging a Due Process violation

when the government recouped money from their banks, causing the banks to debit their accounts without notice or an opportunity to protest. *Id.* at 63. Relying on state action cases and a foreseeability principle from the law of torts, the Second Circuit held that, because the government could have foreseen that the banks would debit the widows' accounts, it was sufficiently intertwined with the actions of the banks, such that the government could be liable under the Due Process clause. *Id.* at 65.

We agree with the Third, Tenth, and Ninth Circuits, and disagree with the Second Circuit. The depositer, unlike the presenting bank, has no claim against the United States.

## VI

█ Finally, Casa seeks the opportunity to establish that Norwest was in fact Casa's agent, thus allegedly enabling Casa as principal to step into the shoes of its agent, Norwest, and assert its claims against the government. The existence of an agency relationship, even if established, would not necessarily result in a waiver of sovereign immunity for suit by the principal. *See generally Ins. Co. of the West,* 243 F.3d 1367, 1373 (Fed.Cir.2001) (subrogee, after stepping into the shoes of a government contractor, may bring suit under the Tucker Act); *First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1293 (Fed.Cir.1999) (waiver of sovereign immunity allows shareholders to assert corporation's rights, but not to bring their own claims through the corporation). Even at common law the mere fact of an agency relationship does not

automatically mean that the agent can step into the shoes of the principal and assert its rights against third parties.[2] In any event, we conclude that we need not address Casa's agency theory because it was not properly raised. No mention of this theory appears in Casa's complaint. Under the circumstances, we hold that Casa waived any claim it may have against the government based on such a theory.

## CONCLUSION

For the forgoing reasons, we *affirm.*

## COSTS

No costs.

---

**2.** The *Restatement (Second) of Agency,* § 293 (1958), recognizes that a third "party to a contract made by an agent on behalf of an disclosed or partially disclosed principal does not become liable to such principal upon it in an action at law if the principal is excluded as a party by the form or terms of the contract." *See also id.* at § 295 (recognizing that when an obligor gives a negotiable instrument to an agent on account of a principal not named or described in the instrument, the obligor "is not liable to the principal in an action upon the instrument, unless the principal is an endorsee or otherwise becomes the holder").